No. 102,847

STATE OF KANSAS, *Appellee*, v. JEFFREY D. RASKIE, *Appellant*.

(269 P.3d 1268)

Opinion filed February 17, 2012.

*Jessica J. Travis*, of the Travis Law Firm, LLC, of Olathe, argued the cause, and was on the briefs for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Defendant Jeffrey D. Raskie was convicted of two counts of aggravated indecent liberties with a child. On appeal he attacks his convictions on several grounds, arguing (1) the district court erred in admitting evidence of certain molestation "grooming" items—photographs, a vibrator, and a corset—that were not used by Raskie or the victim during the charged incidents; (2) the prosecutor committed misconduct by presenting the "grooming" evidence and making comments during closing argument about Raskie's lurid intent; (3) the district court erred in admitting evidence of Raskie's postings on a social networking website because the State failed to lay a proper foundation and because this evidence constituted hearsay; (4) the district court erred in denying Raskie's motions for judgment of acquittal "due to witness inconsistencies and lack of independent evidence"; (5) the district court erred in giving Instruction No. 5, which mirrored PIK Crim. 3d 51.10 (penalty not to be considered by the jury), because it shifted the burden of proof to the defense; and (6) he was denied a fair trial based on cumulative error. We conclude that Raskie either failed to preserve or waived his evidentiary issues and the district court did not err in denying the motions for judgment of acquittal

or in giving PIK Crim. 3d 51.10. The only issue on which we find error is Raskie's prosecutorial misconduct claim relating to closing argument. We conclude this error does not warrant reversal of Raskie's convictions, however.

Raskie also attacks his sentence, arguing his hard 25 life sentence constitutes cruel and/or unusual punishment under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. He argues, in part, that the district court failed to make adequate findings and requests his sentence be vacated and the case be remanded for additional findings. We agree with him on this point.

### FACTS AND PROCEDURAL BACKGROUND

In October 2000, Raskie married his wife, S.R., who had a 7-year-old daughter, C.R., from a previous relationship. Raskie adopted C.R. the following month. During the marriage, the couple had two more children together. Eventually, Raskie and S.R. began experiencing problems in their marriage, mostly related to finances, and in May 2006 the couple separated. By court order, the couple had a shared child-custody arrangement.

On the afternoon of Valentine's Day 2007, which was a day the children were to be with Raskie for the evening and overnight, C.R. told a school counselor she was being sexually abused by Raskie. The counselor called S.R., who in turn called C.R. and said, "I know that you don't like going to your dad's house. Can you please tell me what's going on?" At first C.R. was calm and indicated that she "didn't want to go because he was mean to her. He made her do chores and things like that." Then C.R. got more agitated and upset and said, "And he shows me his penis." S.R. made arrangements for C.R. to stay elsewhere that night.

The next day, S.R. took C.R. to the Olathe Police Department, where they spoke with Detective Kenton Thompson. Thompson suggested taking C.R. to Sunflower House, Inc., a child abuse prevention center, for a physical examination and a forensic interview. S.R. took C.R. to Sunflower House on February 16, 2007, where C.R. was interviewed by a forensic interviewer outside the presence of her mother. Through video monitoring, Thompson ob-

served the interview, in which C.R. indicated that Raskie exposed his genitals to her; showed her pornography; touched her on the breasts and vagina, both over and under her clothing; bent her over a bed and used his penis to penetrate her anus; touched her with vibrators externally on her vagina and anus; bought her lingerie, such as corsets and thong panties; and videotaped her while she showered. C.R. indicated this behavior started when her mother began taking college classes at night. According to C.R., the abuse continued even after her parents had separated. During C.R.'s physical examination, she complained of both physical and sexual abuse.

At some point after the Sunflower House interview, Detective Thompson indicated to S.R. that C.R. had been sexually abused. Thereafter, S.R. took steps to modify the child-custody arrangement and eventually kept the children with her full time.

Officers continued their investigation. Among other things, they monitored Raskie's computer contact with C.R. through C.R.'s account on Myspace, a social networking website, and the officers subpoenaed Myspace to get information on Raskie's account. Also, about a month after the Sunflower House interview, Thompson interviewed C.R., primarily to get information to use in obtaining a search warrant of Raskie's residence. C.R. described a plastic tub next to Raskie's bed, where he kept some vibrators. C.R. also described thong panties and a corset, which were kept in her bedroom dresser at Raskie's residence. In addition, C.R. directed the detective to the video camera in the headboard of Raskie's bed. And C.R. described a photograph she had seen at Raskie's residence, depicting a woman's breast pierced with a nipple ring.

At trial, C.R., who was 15 years old at the time, testified against Raskie. She testified that Raskie started touching her inappropriately when she was around 10 years old. She indicated that every night her mom attended a class, Raskie would come into her room. The first time, C.R. was asleep in her bed when she awoke to find Raskie touching her vagina over her clothing. Over time, the touching progressed. Raskie touched C.R.'s breasts and vagina under the clothing. "Then one day, he started using a vibrator" under the clothing. C.R. described a "skinny purple" vibrator and a "fat pur-

ple" one. She also described other vibrators, including a small "gold" one, about which C.R. said, "He tried giving it to me as a present." C.R. testified about other presents from Raskie, including a "glass vibrator," a "sucker that was in the shape of a penis," thong panties, and corsets. C.R. said she asked for one of the corsets "[b]ecause my friends had them that they wore like under their clothes." When asked if this was "more like a fashion trend than a sexual thing," C.R. said, "Yes." C.R. had another purple corset that she did not ask for. She testified that Raskie bought it for her from Victoria's Secret. She thought he gave it to her on Valentine's Day, but she was not sure.

C.R. testified that on a regular basis Raskie would put his penis and testicles in her face. She testified about another incident where, after her parents had separated, she and Raskie were arguing and she "got pushed over the bed." Then, Raskie "put his penis in [her] butt." C.R. testified that it went inside her body and hurt her "stomach and [her] butt." Raskie stopped because she was elbowing him and fighting to get him off of her. C.R. said this incident happened before her 13th birthday, but Raskie continued to touch C.R.'s vagina and to use a vibrator on her after she turned 13.

C.R. also testified that she had to shower in Raskie's master bathroom because the "hallway bathroom was broken." One time she noticed a red light shining through the shower's glass door. C.R. got out of the shower, followed the light, and discovered a video camera on the headboard in the master bedroom. When C.R. looked at the recordings, she saw videos of herself naked in the shower. She erased the recordings, and Raskie got angry at her. After that, Raskie tried to hide the video camera under Styrofoam or "pillows or something." Sometimes the video camera was on the top shelf of the closet in the master bedroom. C.R. did not tell her mom about any of the sexual abuse because she did not want her mom to know about it and she did not think her mom would believe her.

Raskie testified in his own defense. He generally denied sodomizing C.R. or touching her inappropriately. He also denied showing her pornography. Instead, Raskie said that C.R. showed

him an explicit video of a father sexually abusing his daughter. According to Raskie, the situation with C.R. "got out of control" after he and his wife separated, and C.R. "wasn't doing anything that she was supposed to do, her chores or anything like that. She wasn't coming home from school. She wasn't doing her homework. She just let the bottom drop out." Raskie admitted that he and his wife purchased vibrators, but he denied ever using them on. C.R. or buying them for C.R. Raskie admitted buying thong panties for C.R. but said he purchased those because C.R. asked for them and he "wanted her to feel good about herself." As for the corsets, Raskie testified that C.R. mentioned that some of her friends were wearing them and that she would like to try them. He was checking his e-mail one day when a Victoria's Secret advertisement came up on the computer screen; C.R. asked him about it, so he clicked on the link and showed C.R. the website. During this computer browsing session, he purchased bras, panties, and a purple corset for C.R. Later, he also bought C.R. a black corset from another store because she did not like the purple one. Raskie indicated that the corsets were just a fashion statement.

Raskie also testified that on one occasion he found C.R. masturbating with a vibrator and on another occasion he came home to find that C.R. had put lotions and vibrators on his bed. According to Raskie, C.R. told him that her friends at school had vibrators and she also told him that two of her friends had been sexually abused. Raskie denied hitting C.R., and while he admitted to having arguments with C.R. over telephone usage, he denied ever attacking C.R. sexually during one of those arguments. Raskie also denied videotaping C.R. while she showered. He did not remember putting the video camera on the headboard of his bed. Raskie thought his estranged wife put C.R. up to making false allegations.

The jury acquitted Raskie of one count of aggravated criminal sodomy but convicted him of two counts of aggravated indecent liberties in violation of K.S.A. 21-3504. Although both convictions were for the same crime, the potential penalties differed because one offense occurred before and the other after July 1, 2006, which was the effective date of K.S.A. 21-4643, commonly referred to as Jessica's Law. Jessica's Law increased the potential penalty for cer-

tain enumerated offenses, including aggravated indecent liberties with a child under 14 years of age in violation of K.S.A. 21-3504. The increased penalty applies if the offense was committed on or after the effective date of the law by a defendant who is 18 years of age or older. When applicable, Jessica's Law, as it applied at the time of Raskie's offense, requires that the defendant "shall be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years" unless, for first-time offenders, substantial and compelling reasons justify a departure. K.S.A. 21-4643(a)(1), (d). Raskie's offense that occurred before the effective date of Jessica's Law was classified as a severity level 3 person felony.

Raskie was sentenced to a hard 25 life sentence for the Jessica's Law off-grid offense and 61 months for the severity level 3 offense. He now timely appeals his convictions and sentence. This court has jurisdiction under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

## ADMISSIBILITY OF "GROOMING" ITEMS

First, Raskie takes issue with the district court's decision to admit evidence of certain items Raskie refers to as "grooming" items—four risqué photographs of an unidentified woman, a black and gold vibrator, and a black corset—that were not used by Raskie or C.R. during the alleged incidents of aggravated indecent liberties charged in this case. At trial, Raskie made a relevancy objection when the State sought to admit these exhibits. On appeal, he adds other arguments as to why this evidence, which he contends the State was presenting to show that Raskie was grooming C.R. for sexual activity, was inadmissible. These additional arguments were not preserved. K.S.A. 60-404 "dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009); see also *State v. Race*, 293 Kan. 69, 78, 259 P.3d 707 (2011) (parties are not permitted to object to the introduction of evidence on one ground at trial and then assert another ground on appeal).

As to Raskie's relevancy objection, it was asserted as to only a small portion of related evidence. Raskie did not object when police photographs of the black and gold vibrator and the black corset were admitted into evidence. Nor did he object when a photocopy of the risqué photographs was admitted into evidence. Additionally, other vibrators and lingerie, including two purple vibrators, a purple corset, and three pairs of thong panties, were admitted without any objection. Consequently, even if we were to conclude that error occurred in admitting the objected-to exhibits, any harm from that error could not be separated from the harm caused by admitting the similar (and somewhat cumulative) evidence. We do not find the actual objects to be any more prejudicial than a photocopy or picture of the objects. In other words, if there was error in admitting these exhibits, there is no reasonable probability the potential error affected the outcome of the trial. Therefore, the admission of the evidence, even if we assume it was erroneous, was harmless. See *State v. Ward*, 292 Kan. 541, 564-65, 256 P.3d 801 (2011) (under harmless error test of K.S.A. 60-261 and K.S.A. 60-2105, appellate court must be persuaded there is no reasonable probability error affected outcome of the trial).

## PROSECUTORIAL MISCONDUCT

Next, in a related issue, Raskie argues for the first time on appeal that the prosecutor committed misconduct by presenting the "grooming" evidence and making comments during closing argument about Raskie's lurid intent. Raskie asserts that the prosecutor essentially sought to establish a psychological theory which was "beyond the knowledge of a normal juror" and thus was "obligated to present an expert to establish a nexus of relevancy before arguing that the condition exists." The failure to present such expert testimony, according to Raskie, violated his constitutional right to a fair trial.

### Standard of Review

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. Under either an evidentiary analysis or a prosecutorial misconduct analysis, this court begins by deter-

mining whether the prosecutor's questions or actions were proper. This inquiry would answer whether the questions or actions were within the latitude allowed the prosecutor. Then, if there was misconduct, an appellate court determines if reversal is required; the reviewing court must determine (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Inkelaar*, 293 Kan. 414, 427, 264 P.3d 81 (2011); *State v. Adams*, 292 Kan. 60, 66, 253 P.3d 5 (2011); see *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

In a case where the defendant has established an error of constitutional magnitude, it is the State's burden, as the party benefitting from the error, to prove beyond a reasonable doubt that the error did not affect the defendant's substantial rights. *State v. Hall*, 292 Kan. 841, Syl. ¶ 15, 257 P.3d 272 (2011); *Ward*, 292 Kan. 541, Syl. ¶ 6.

### Evidentiary Prosecutorial Misconduct

With regard to Raskie's claim of misconduct based on evidentiary error, he acknowledges that he failed to object at trial to all of the evidence about which he now complains. Moreover, before the district court, he never expressed his argument that a psychological expert had to testify to a link between the grooming behavior and the crimes in order for there to be a foundation supporting the admissibility of the evidence. His failure to make a contemporaneous and specific objection means his appellate argument is not preserved.

Under K.S.A. 60-404, this court has established that "a contemporaneous objection must be made to all evidentiary claims—including those alleging prosecutorial misconduct—to preserve the issue for appellate review." *State v. Shadden*, 290 Kan. 803, 835, 235 P.3d 436 (2010); see *King*, 288 Kan. at 349. The rule is more than a procedural trap; it reflects the policies of having a trial that is a full and fair proceeding and of achieving a final judgment. By seeking to have issues fully explored during the district court pro-

ceedings, any error or potential error can be avoided and the district court is able to fulfill its intended role as gatekeeper of admissible evidence. *King*, 288 Kan. at 349. Here, neither the State nor the district court had the opportunity to address or consider Raskie's arguments regarding the need for an expert witness. Consequently, the appellate issue was not preserved.

*Prosecutorial Misconduct During Closing Argument*

Similarly, Raskie did not object to the alleged prosecutorial misconduct during closing argument. But, unlike allegations of prosecutorial misconduct that arise as evidentiary claims, a contemporaneous objection is not required to preserve a prosecutorial misconduct claim based on remarks made during voir dire, opening statements, or closing arguments, which are not evidence. See *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011); *State v. Stone*, 291 Kan. 13, 17, 237 P.3d 1229 (2010); *King*, 288 Kan. at 349.

As with the previous issue, Raskie's arguments revolve around his assertion that it was improper for the State to attempt to prove that he was grooming C.R. for sexual activity without having provided an expert opinion. Again, however, this argument was not presented at trial. The concept of "grooming" was first discussed during the hearing on Raskie's motion in limine. The following exchange occurred:

"The Court: Was the State's contention the defendant was grooming this young girl for sex and the toys and garments were just part of that grooming?

"[Prosecutor]: If the question is, is this prejudicial, the answer is yes, it is prejudicial, but it is not more prejudicial than probative. It's part and parcel. It's a suggestive clothing store. You buy suggestive clothing for adults. We're talking about a middle-age man and dildos, vibrators, and sex toys, and clothes, and for a 13- to 14-year-old girl. It's all part and parcel of the charm.

"I am asking that you not preclude us from entering [these items] into evidence."

Not only did the State stop short of referring to the exhibits as evidence of "grooming" in response to the court's question, during the trial the prosecutor never told the jury the evidence of vibrators, lingerie, and photographs was evidence of "grooming."

Nevertheless, Raskie suggests the link was made by the prosecutor during closing argument. In discussing the evidence, the prosecutor stated, in part:

"Ladies and gentlemen, it's not illegal to have any of this. It's not illegal to own vibrators or sex toys. It's not illegal to buy vibrators or sex toys for your children. Lots of us might think that's inappropriate, but it's not illegal to own lingerie or buy your kids lingerie or thongs. It's not illegal to have adult pornography or explicit photos of you and your sex partner or other people laying [sic] around the house. . . . It's not illegal to have bizarre pictures of your children. It's not illegal to have a video camera. None of this is illegal, but doesn't it shed some light on what was going on in [C.R.]'s life?"

Defense counsel touched on the issue as well during his closing argument, stating in part:

"It's not illegal. It's not even wrong. It may be strange. . . . There's nothing illegal or wrong about it. . . .

. . . .

"Again, those are undergarments, folks. That's all they are. It's a smokescreen. It's designed to make us think just because [Raskie] candidly admitted he bought those things for his daughter that he must have touched her. Just because he bought those or just because these vibrators were found in his house, he must have anally penetrated her sometime. Even that's all over the board."

The prosecutor responded during rebuttal closing argument by stating:

"I'm sorry if I'm portraying to you an attitude of disgust, but that's what it is. Look at this. Do you buy into the [defendant's] argument that none of this is wrong? There's a difference between something being illegal and something being wrong. This is not illegal. *But when you put it with what [C.R.] says, it is wrong. It does rise to the level of criminal conduct.*" (Emphasis added.)

The first explicit acknowledgement by the prosecutor of the grooming motivation occurred during arguments on Raskie's post-trial motions. Then, the prosecutor argued to the district court that the evidence did show that Raskie was grooming C.R.:

"I think that my arguments and the testimony that I elicited at trial and the manner in which I formed my case all pointed towards [grooming]. Now, whether or not I used the word grooming, I certainly don't recall. My position is still that that's exactly what was going on. That's what those purchases were for. That's what those sex toys were for. That's what the gifting was for. That's the manner in which the defendant acted and spoke to his adopted daughter. All of those things I still

believe were grooming. They ultimately resulted in illegal touching and fondling and molesting."

Raskie argues the prosecutor's implications of grooming amounted to prosecutorial misconduct because (1) the "grooming" evidence was "pervasive throughout trial"; (2) "though seemingly sanctioned by the court, the admission of the evidence was not accidental and [was] argued with emotion during closing ('I am sorry if I am portraying to you an attitude of disgust, but that's what it is.')"; and (3) "the evidence would carry more than a little weight" because of the "pervasiveness, distasteful nature of evidence, [and] victim credibility issues."

Raskie does not explain why an expert was necessary when the State neither mentioned the word "grooming" nor argued to the jury that such a "condition exists." In the State's brief, it does not respond to Raskie's argument that expert testimony was required. Instead, the State simply contends the prosecutor was commenting on admitted evidence, evidence that was mostly admitted without objection.

The State is correct that generally a prosecutor may comment on admitted evidence during the closing arguments. See *Tosh*, 278 Kan. at 90. The validity of the rule is especially strong where the evidence was admitted after the district court heard and overruled a defendant's arguments against admission of that evidence, as was the case here. The prosecutor makes the argument based on a presumption that the evidence was properly admitted and without the ability to predict new arguments that a defendant might present for the first time in a subsequent appeal. Nevertheless, there are qualifications to this general rule; specifically, a prosecutor's remarks must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law." *Tosh*, 278 Kan. at 90.

Here, the prosecutor crossed the line by misstating the law. Specifically, the prosecutor told that jury that "it"—seemingly referring to Raskie's acts of purchasing and gifting erotic items—"does rise to the level of criminal conduct."

Because there was a misstatement of the law, we move to the second step of the prosecutorial misconduct analysis to determine if Raskie was denied a fair trial. When looking for plain error, we must first consider whether the prosecutor's comments were gross and flagrant. In doing so, we note that the prosecutor also stated that the purchases and gifts were not illegal. These contrary statements can be found in the initial portion of the closing arguments, quoted above, and just two sentences before the offending statement. Where a prosecutor "makes both a misstatement of the law and a correct recitation of the applicable law in a closing argument, we have been loathe to characterize the misstatement as being gross and flagrant misconduct. [Citation omitted.]" *State v. Naputi*, 293 Kan. 55, 62, 260 P.3d 86 (2011). Neither does such a situation support a finding of ill will. *Naputi*, 293 Kan. at 62. Further, contrary to the point of Raskie's argument, the prosecutor did not attempt to step into the role of a psychologist by connecting the acts of purchasing and gifting the objects to the concept of grooming C.R. for sex. Finally, reviewing the entire record, we are convinced beyond a reasonable doubt that the prosecutor's misstatement did not affect the outcome of the trial. See *Ward*, 292 Kan. at 565.

Hence, while we find there was a statement outside the wide latitude allowed the prosecutor, we do not find reversible prosecutorial misconduct.

## MYSPACE EVIDENCE

Next, Raskie contends for the first time on appeal that the district court erred in admitting evidence of his Myspace postings because the messages were admitted without first establishing a proper foundation under K.S.A. 60-460(m) (business entries and the like) or K.S.A. 60-464 (authentication of a writing) and because the messages constituted hearsay evidence in violation of his confrontation rights. See *Crawford v. Washington*, 541 U.S. 36, 54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); Kan. Const. Bill

of Rights, § 10 (a criminal defendant in Kansas has the right to "meet the witness face to face").

This issue was not preserved for appeal, however, for several reasons. First, Raskie failed to make a contemporaneous trial objection. See *King*, 288 Kan. at 349. Second, constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *State v. Leshay*, 289 Kan. 546, 553, 213 P.3d 1071 (2009); *King*, 288 Kan. 333, Syl. ¶ 4. Finally, with regard to Raskie's foundation claim, he makes only a passing reference to K.S.A. 60-460(m) and K.S.A. 60-464 and fails to assert any supporting arguments; this failure to adequately brief the issue constitutes a waiver of the argument. See *State v. Conley*, 287 Kan. 696, 703, 197 P.3d 837 (2008) (failure to support a point with pertinent authority or without showing why it is sound despite lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue); *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008) (same).

Consequently, we do not reach the merits of Raskie's arguments.

## MOTIONS FOR JUDGMENT OF ACQUITTAL

At the close of the State's evidence, at the close of all the evidence, and again after the verdict, Raskie moved for judgment of acquittal. The district court denied all three motions. On appeal, Raskie argues there was insufficient evidence to support his convictions and, therefore, the district court erred in denying his motions for judgment of acquittal. Specifically, Raskie contends the State failed to prove its case "[d]ue to witness inconsistencies and lack of independent evidence." Raskie's contention lacks merit.

### Standard of Review

In reviewing the denial of a motion for judgment of acquittal, the appellate court examines the sufficiency of the evidence in support of the conviction. *State v. Cavaness*, 278 Kan. 469, 479, 101 P.3d 717 (2004); *State v. Wiggett*, 273 Kan. 438, 443, 44 P.3d 381 (2002). The applicable standard of review is well known: When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in

the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Ward*, 292 Kan. at 581; *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 (2010). The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Ward*, 292 Kan. at 581.

To prove the aggravated indecent liberties charges, the State had to show that Raskie engaged in lewd fondling or touching of the victim, C.R., who was under 14 years of age, with the intent to arouse or satisfy the sexual desires of Raskie or C.R. See K.S.A. 21-3504 (a)(3)(A). In arguing the State failed to establish these elements, Raskie focuses on the lack of physical evidence. He argues this case was transformed primarily into a credibility battle.

Raskie is substantially correct that there was little or no physical evidence. For example, there was no physical evidence of sexual trauma or physical abuse. And while there was DNA evidence that could tie C.R. to the vibrators, there was evidence from which the jury could have concluded C.R. used the vibrators herself; in other words, this physical evidence did not establish that Raskie used the vibrators on C.R. Hence, as Raskie states, the case was largely a credibility contest. To support his insufficiency argument, Raskie points to "inconsistencies" in C.R.'s version of events. Most of the inconsistencies he points to relate only to the aggravated sodomy allegation, the offense of which Raskie was acquitted. This acquittal, he argues, indicates "credibility issues" on the other charges as well.

In effect, Raskie asks this court to reweigh the evidence and assess credibility. That is not the role of an appellate court. See *State v. McMullen*, 290 Kan. 1, 4, 221 P.3d 92 (2009) (appellate court does not reweigh the evidence, resolve conflicting evidence, or assess the credibility of the witness). A jury that has convicted a defendant is presumed to have believed the State's evidence and to have drawn from that evidence all inferences favorable to the State. *State v. Aikins*, 261 Kan. 346, 392, 932 P.2d 408 (1997).

Our review of the record reveals that the State presented sufficient evidence to support Raskie's aggravated indecent liberties convictions beyond a reasonable doubt. The forensic interviewer

from Sunflower House testified that "kids who have experienced abuse over a lengthy period of time, they may lose some of those peripheral details . . . that might make the abuse unique. They will have just the general kind of overview of typically something that happened." This testimony explained some of the inconsistencies Raskie points out and makes the jury's reliance on C.R.'s testimony reasonable. Moreover, C.R.'s statements and testimony were consistent in establishing all of the necessary elements for the offenses. She told the forensic interviewer about vaginal touching and about Raskie's putting his penis and "balls" in her face. As confirmed by Detective Thompson's observation of the Sunflower House interview, C.R. indicated that Raskie touched her on the breasts and vagina, both over and under her clothing. C.R. also described Raskie touching her with vibrators externally on her vagina and anus. C.R.'s friend A.G. testified that C.R. told her about the inappropriate touching by Raskie. C.R. also testified that Raskie touched her breasts and vagina with his hands and used vibrators on her vagina.

Viewing the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Consequently, the district court did not err in denying Raskie's motions for judgment of acquittal.

## PIK CRIM. 3d 51.10

Next, Raskie argues that the district court erred when it instructed the jurors in Instruction No. 5 that the jury's "only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court." According to Raskie, the instruction impermissibly shifted the burden to the defense to prove he was not guilty. Raskie cites no legal authority in support of this contention and raises this argument for the first time on appeal. In fact, during the hearing on the jury instructions, defense counsel stated, "No objection," to Instruction No. 5.

Because Raskie did not object to Instruction No. 5, this court applies the clearly erroneous standard of review. See K.S.A. 22-

3414(3); *State v. Colston*, 290 Kan. 952, 969, 235 P.3d 1234 (2010); *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009).

As both parties agree, Instruction No. 5 was based on PIK Crim. 3d 51.10. The jury instruction in PIK Crim. 3d 51.10 has been approved by this court and is given because juries should not consider the ultimate disposition of the case. See *State v. Yardley*, 267 Kan. 37, 42, 978 P.2d 886 (1999); *State v. Osburn*, 211 Kan. 248, 254, 505 P.2d 742 (1973). Despite Raskie's argument to the contrary (and assuming no lesser included offenses are involved), a jury must choose between two options (guilty or not guilty) in order to reach a verdict in a case. Stating this fact to the jury does not dilute or destroy the presumption that the defendant is not guilty (the first option) unless the State proves beyond a reasonable doubt that the defendant is guilty (the second option). The second option is discussed in other jury instructions that clearly inform the jury the State has the burden of proof to establish the defendant's guilt beyond a reasonable doubt. "In reviewing jury instructions for error, we examine the instructions as a whole, rather than isolate any one instruction, and determine if the instructions properly and fairly state the law as applied to the facts of the case. [Citations omitted.]" *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009), *cert. denied* 560 U.S. 966 (2010). Read together, the instructions in this case were accurate statements of the law and did not shift the burden of proof to Raskie.

As a result, we do not find error in the giving of Instruction No. 5 to the jury.

### CUMULATIVE ERROR

Next, Raskie argues that cumulative error deprived him of a fair trial. The cumulative-error doctrine does not apply if there is no error or only one error. *State v. Miller*, 293 Kan. 535, 582, 264 P.3d 461 (2011); *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). Because we have found only one error (prosecutorial misconduct for a misstatement of the law in closing arguments), this issue lacks merit.

We affirm Raskie's convictions.

CRUEL AND UNUSUAL PUNISHMENT

Raskie next raises arguments regarding his sentence. The life sentence imposed upon Raskie was statutorily mandated. Under K.S.A. 21-4643, for certain enumerated offenses—including aggravated indecent liberties with a child under 14 years of age, in violation of K.S.A. 21-3504—committed on or after July 1, 2006, by a defendant who is 18 years of age or older, the legislature requires that the defendant "shall be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years" unless, for first-time offenders, substantial and compelling reasons justify a departure. K.S.A. 21-4643(a)(1), (d).

Raskie argues that his hard 25 life sentence constitutes cruel and/or unusual punishment under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. The State contends that Raskie did not adequately preserve this issue for appellate consideration.

As the State points out, this court has frequently determined a defendant has failed to preserve state or federal constitutional claims pertaining to the issue of whether a term-of-years sentence constitutes cruel and/or unusual punishment where "there was no effort before the district court to present the issue." *State v. Mondragon*, 289 Kan. 1158, 1164, 220 P.3d 369 (2009); see *State v. Naputi*, 293 Kan. 55, 67, 260 P.3d 86 (2011); *State v. Easterling*, 289 Kan. 470, 485-87, 213 P.3d 418 (2009); *State v. Spotts*, 288 Kan. 650, 652-54, 206 P.3d 510 (2009); *State v. Thomas*, 288 Kan. 157, 160-61, 199 P.3d 1265 (2009); *State v. Ortega-Cadelan*, 287 Kan. 157, 159-61, 194 P.3d 1195 (2008). Further, we have required more than simply mentioning the words "cruel and unusual punishment." See, *e.g.*, *State v. Garza*, 290 Kan. 1021, 1032-34, 236 P.3d 501 (2010).

In contrast to these cases, however, Raskie did make the effort to present the issue before the district court and did more than make a brief statement in a motion. Before sentencing, defense counsel filed a motion asking the court to continue Raskie's sentencing and "to set a hearing date and time for the Defendant to

present his argument to the Court that the sentence he could receive under the 'Jessica's Law' conviction, Count 3, is disproportionate punishment and unconstitutional." Then, at the sentencing hearing, although defense counsel did not specifically cite to either the Kansas Constitution or the United States Constitution, defense counsel cited to the three-factor test in *State v. Freeman*, 223 Kan. 362, Syl. ¶ 2, 574 P.2d 950 (1978), and asked the district court for time to submit additional written arguments in order to "preserve that constitutional issue for appeal." On the record, the State opposed any continuance. Ultimately, the judge summarily denied Raskie's motion for a continuance and found that his hard 25 life sentence was not unconstitutional.

While Raskie's arguments to the district court could have been more detailed, he presented arguments to the district court at sentencing and directed the district court to the three factors that are to be considered under *Freeman*. These efforts are similar to those made by the defendant in *State v. Seward*, 289 Kan. 715, 720-21, 217 P.3d 443 (2009), where Seward's federal and state constitutional challenges were mentioned during plea negotiations, included in Seward's written motion for a downward durational departure, and restated on the record at his sentencing hearing. We concluded those efforts were sufficient to preserve the issue. We reach the same conclusion in this appeal.

The State next argues that the district judge sufficiently addressed the *Freeman* analysis when he stated:

"That's the prerogative of the legislature. They have determined that these types of offenses should be considered off-grid and should be given a stronger punishment than before.

"So . . . I'm not in a position and will not conclude that the legislature acted unconstitutionally with respect to the law change [in enacting Jessica's Law in 2006]. . . .

. . . .

"I know [defense counsel] has some legal authorities he wants to present in this case. I am of the opinion, based on what I am familiar with here on the law, that there is no constitutional affirmative with respect to Count 3 as it's been charged."

Clearly, these findings do not address each of the *Freeman* factors, which require an examination of:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishment imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

Once again, this case resembles the facts of *Seward*, 289 Kan. 715, where the defendant took steps to raise the constitutional issue before the district court, but the district court's findings were inadequate for purposes of appellate review. In *Seward*, this court faulted both the district court and the defendant for failing to make an adequate record. The *Seward* court noted that counsel failed to move the district court pursuant to Supreme Court Rule 165 (2011 Kan. Ct. R. Annot. 246) for further findings, but noted that there had been confusion in Kansas caselaw regarding whether the burden of assuring that findings were adequate for appeal fell on a party or on the district court. Considering the circumstances, this court remanded the case to the district court to apply the *Freeman* factors. *Seward*, 289 Kan. at 718-22. In doing so, this court cautioned, however, that such an outcome was an exceptional situation; central to that decision was the finding that the defendant had adequately raised the issue before the district court. *Seward*, 289 Kan. at 721.

*Seward* was filed on October 2, 2009. The journal entry in Raskie's case was filed June 29, 2009, *i.e.*, before this court had made it clear that a defendant would have the duty to ensure adequate findings of fact. Hence, when Raskie's journal entry was filed, his duty under Rule 165 was unclear. Under similar circumstances, this court has followed *Seward* and has remanded for entry of sufficient factual findings and conclusions of law on the issue of whether the defendant's sentence violates § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment to the United

States Constitution. *State v. Berriozabal*, 291 Kan. 568, 591-92, 243 P.3d 352 (2010).

We conclude it is appropriate to vacate Raskie's hard 25 life sentence and remand for consideration of his motion regarding the constitutionality of his sentence. Given our holding on this issue, we will not address Raskie's argument that the district court erred in denying his motion for departure because on remand the arguments relating to the request for departure may change and any comments we make would consequently be of little guidance.

Raskie's convictions are affirmed, his hard 25 life sentence is vacated, and the case is remanded for consideration of Raskie's motion regarding his claim of constitutional error pertaining to his sentence and then resentencing.