NOT DESIGNATED FOR PUBLICATION

No. 128,409

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of K.P., a Minor Child.

MEMORANDUM OPINION

Appeal from Seward District Court; DAMON SIMMONS, magistrate judge. Submitted without oral argument. Opinion filed July 25, 2025. Affirmed.

*Barbara Nash*, of Barbara Nash Law, of Liberal, for appellant natural mother.

*Russell Hasenbank*, county attorney, for appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: K.P. was born in a hospital in Liberal, Kansas. The baby was under the influence of drugs at birth and then began to experience withdrawal symptoms. His Mother had used drugs during her pregnancy. The hospital notified the appropriate authorities about his condition, and a child in need of care case was opened on June 5, 2023, about a week after his birth.

The court placed K.P. in State custody. He stayed in the hospital until his withdrawal symptoms subsided. After that, K.P. went home with his Mother's sister. His Father is a registered member of the Potawatomi Tribe. Ultimately, both parents' parental rights have been terminated, and Mother appeals. Father does not appeal.

Considering the issues raised in this appeal, we must decide whether the Indian Child Welfare Act applies, and if so, whether it was properly followed by the court. Our

1

review compels us to hold that it does apply and that the court thus followed the Act correctly. Thus, we affirm.

*This case focuses on what Mother failed to do after K.P. was born.*

On August 15, 2023, Mother did not contest the child in need of care petition. The district court found K.P. was a child in need of care and placed him with his maternal aunt. The court found K.P. was an Indian child because Father was a registered member of the Potawatomi Tribe. A representative of the Tribe appeared at the hearing.

The district court ordered Mother to comply with several case plan tasks set out by St. Francis Ministries to work toward reintegration with K.P. The tasks included:

- obtain and maintain appropriate housing,
- have a way to financially support her family and provide a budget upon request,
- complete a mental health intake and follow recommendations,
- complete a drug and alcohol evaluation and follow recommendations,
- sign releases,
- complete random UAs and mouth swabs upon request, and
- attend a parenting class.

St. Francis initially offered Mother weekly supervised visitation conditioned on negative UAs. But Mother did not attend any visits with K.P. in 2023.

Mother did not complete UAs between August and October 2023. She was using drugs heavily. In October 2023, Mother had a positive UA. On October 18, 2023, Mother

was arrested and incarcerated until January 25, 2024. Mother had minimal contact with St. Francis and did not complete any case plan tasks before her arrest.

In January 2024 the district court found that the reintegration of K.P. with Mother was no longer a realistic case goal. A few days later, the State filed a motion for the court to find Mother unfit to parent and to terminate her parental rights to K.P.

*Mother showed little interest in parenting K.P.*

Mother entered a 28-day inpatient drug and alcohol treatment program in January 2024. She completed the program in February and then attended outpatient treatment. Unfortunately, Mother tested positive for methamphetamine in March 2024. Although Mother has not tested positive since then, she did not complete some of her UAs scheduled in March, April, and May 2024.

In April 2024, Mother started working as a housekeeper at a Holiday Inn. In July 2024, Mother spent time in jail in Seward County on a probation violation for testing positive for methamphetamine in March. In August, Mother tested negative for drugs. That month, she pled no contest to an aggravated nonresidential burglary, a person felony.

*Evidence at the termination hearing portrayed Mother as incapable of parenting K.P.*

The district court, on September 10, 2024, heard the motion for termination of parental rights. Candace Quest, the case manager for St. Francis, testified that the main issues for Mother were substance abuse and incarceration. Quest testified Mother had completed most of her case plan tasks but recommended termination of Mother's parental rights because she had been in-and-out of jail and she might relapse on her substance

3

abuse. A relapse would not provide stability for K.P. Mother had completed her parenting classes. Mother was not in custody at the time of the termination hearing.

Though Mother had a job at a Holiday Inn, at that time, she had not provided any financial support for K.P. or provided a budget to her case worker. St. Francis had not worked with Mother to determine whether her income was sufficient to support K.P. Since July 2024, Mother was living at the Cozy Inn. Before that, she had been staying at the Holiday Inn. Quest did not believe the Cozy Inn was suitable for K.P. but Quest had not done a walk-through of it. Quest testified St. Francis had offered housing at Landmark Authority, but Mother did not fill out an application.

Quest testified Mother did not visit K.P. before October 2023 due to lack of interest. Mother has never had any unsupervised visits with K.P.

Nancy Jasna, a case manager for Firelodge Children and Families Service for the Potawatomi Nation Tribe, testified. She had been previously recognized as a qualified expert witness under the Indian Child Welfare Act. Jasna believed Mother's continued custody of K.P. was likely to result in serious emotional or physical damage to K.P. because Mother had been incarcerated and abused substances. She had not met Mother because Mother had not contacted her and was relying on the information in the court reports. Jasna testified that the maternal aunt who was caring for K.P. had been very involved and contacted her weekly. Jasna believed the aunt was the only mother figure K.P. knew and that she should adopt K.P.

Mother testified that she had just moved into a one-bedroom apartment that was part of the Cozy Inn. It was bigger than the hotel room she was previously in and could accommodate K.P. She testified that her case worker did not tell her she had to fill out an application to get housing at Landmark. Mother was making $10.50 an hour as a

4

housekeeper at the Holiday Inn. She said that her oldest daughter and Father's parents could help with daycare if she had custody of K.P.

Mother testified she had only used drugs once (in March) since her arrest in October 2023. She was checking in with her probation officer, attending outpatient drug classes, and talking to her sponsor every week. She had unresolved misdemeanor theft and possession charges in Finney County from 2023. Her probation was reinstated in her Seward County case. She would be sentenced for a burglary conviction in October and she believed she would be getting probation. Her crimes were all related to her drug addiction.

Mother testified she had five other children who were not in her physical custody but had not been removed in a child in need of care proceeding. She testified she wanted custody of K.P. She knew she had made mistakes due to her addiction that began in November 2021 but before her addiction she was a good mom.

*The court announced its decision.*

From the bench, the district court ruled Jasna was a qualified expert witness under the Act. The court found Mother had made a lot of progress in the past couple months. She had been clean and sober since May. But there were issues with incomplete drug tests and her ability to provide for K.P.

The court found clear and convincing evidence that Mother was unable to care for the child and that it was unlikely to change in the foreseeable future. The court found there had been reasonable and active efforts to prevent breakup of the family and that there was evidence beyond a reasonable doubt that the child needed placement sooner rather than later due to his young age and need for permanency. Considering the physical,

5

mental, and emotional health of the child, the court terminated both parents' parental rights.

In its journal entry, the court found, "There is evidence beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. Child needs permanency and qualified expert witness testified to that fact." The court found termination of parental rights was in K.P.'s best interests. Only Mother appeals.

Mother raises two arguments. First, she contends the court used an incorrect standard of proof: clear and convincing instead of the beyond a reasonable doubt standard as required by the Act. Second, Mother argues that the State presented no evidence that the State made any active efforts toward providing remedial services and rehabilitative programs to assist Mother. A showing of those efforts is required by the Act. We will address separate components of Mother's issues separately.

The State responds to Mother's arguments by first contending that the Act does not apply here because K.P. was never in Mother's custody. Next, the State argues that the record displays ample evidence of active efforts by the State to help Mother before the court was forced to terminate her parental rights to K.P.

We will first address the State's contention that the Act does not apply.

*The Indian Child Welfare Act applies here.*

This issue was not raised below. Generally, issues not raised before the district court cannot be raised on appeal. See *In re N.E.*, 316 Kan. 391, 407, 516 P.3d 586 (2022). There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the district court was right for the wrong

6

reason. *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009).

The State somewhat argues that the district court was right for the wrong reason here. In other words, the termination of Mother's parental rights under the state-law standard can be upheld because the Act did not apply. We will therefore address the issue.

The State argues that the district court erred by applying 25 U.S.C. § 1912(d) and (f) to this case. The State contends that Act does not apply because K.P. was never in Mother's physical or legal custody, citing *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 133 S. Ct. 2552, 186 L. Ed. 23 729 (2013), as authority.

Termination of parental rights of Native American children is governed by the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq. Kansas law states in K.S.A. 2023 Supp. 38-2203(a) that the Revised Kansas Code for Care of Children does not apply whenever the Act applies. See *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010). To terminate parental rights of an Indian child, the Act requires evidence beyond a reasonable doubt, including qualified expert testimony, "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). This is a higher burden than the Child in Need of Care Code's clear and convincing evidence standard. *In re M.F.*, 290 Kan. at 149-50. The party seeking termination of parental rights of an Indian child must also show "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

Congress enacted the law out of concerns that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"; "that an

alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies"; and "that the States, exercising their recognized jurisdiction over Indian child custody proceedings . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(3)-(5); *Haaland v. Brackeen*, 599 U.S. 255, 265, 143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023).

The case that is pertinent here is *Adoptive Couple v. Baby Girl,* 570 U.S. 637. In *Baby Girl*, the United States Supreme Court held 25 U.S.C. § 1912(d) and (f) do not apply when the relevant parent never had custody of the child. 570 U.S. at 641. The phrase "continued custody" in 25 U.S.C. § 1912(f) refers to custody that a parent already has or had at some point. 570 U.S. at 648. And the term "breakup" in 25 U.S.C. § 1912(d) means the discontinuance of an existing relationship. 570 U.S. at 651-52. The Court stated, "the Act was primarily intended to stem the unwarranted removal of Indian children from intact Indian families." 570 U.S. at 649.

Federal regulations have since defined "continued custody" to mean "physical custody or legal custody or both, under any applicable Tribal law or Tribal custom or State law, that a parent or Indian custodian already has or had at any point in the past. *The biological mother of a child has had custody of a child.*" (Emphasis added.) 25 C.F.R. § 23.2.

The case the State relies upon—*Baby Girl*—can be readily distinguished. In *Baby Girl*, the relevant parent was the biological father. The birth mother and biological father of Baby Girl were not married, so the biological father never had legal custody of Baby Girl under state law. Prior to Baby Girl's birth, the biological father told the birth mother via text message that he wanted to relinquish his parental rights. The birth mother voluntarily put Baby Girl up for adoption. 570 U.S. at 643, 650. While the adoption was

8

pending, the biological father sought custody and took a paternity test. A trial took place two years after Baby Girl's birth. Because the adoptive couple had not shown under 25 U.S.C. § 1912(f) that Baby Girl would suffer serious emotional or physical damage if the biological father had custody, the family court awarded custody to biological father, whom Baby Girl had never met. 570 U.S. at 645. In reversing that decision, the Supreme Court emphasized that the biological father had "abandoned" the child before birth and "never had legal or physical custody" of the child. 570 U.S. at 641, 650.

Here, the relevant parent is the birth mother who carried the child, gave birth to the child, and had both legal and physical custody of the child until several days after the child's birth when the child was finally removed from her custody by court order. Mother then had several visits with K.P. before her parental rights were terminated. *Baby Girl* does not apply to these facts. Subsequent federal regulations make clear Mother had custody of K.P. as the biological mother. See 25 C.F.R. § 23.2.

We reject the State's claim that the Act does not apply here. We turn now to an issue about Mother's unfitness to parent.

*We examine an issue that was raised within Mother's first issue.*

The district court found that Mother was unfit to parent and that condition was unlikely to change in the foreseeable future. Mother questions whether the evidence supported this finding. Mother argues the district court's decision that her condition was unlikely to change in the foreseeable future was not supported by clear and convincing evidence because no one testified to her prognosis for remaining drug free, her case worker never performed a walk-through of her home, and her case worker did not have adequate knowledge of her criminal cases.

Kansas courts apply a two-step approach for termination of parental rights cases involving an Indian child: (1) applying the state law test for terminating parental rights set forth in K.S.A. 38-2269 and (2) applying ICWA standards. *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021).

Under state law, the district court may terminate parental rights of a child in need of care when the court finds "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

Termination of parental rights under Kansas law will be upheld on appeal if, after reviewing the evidence in the light most favorable to the State, "the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020), *cert. denied* 141 S. Ct. 1464 (2021). We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

When determining whether a parent's unfitness is unlikely to change in the foreseeable future, the court may look at the parent's past conduct as an indication of the parent's future behavior. In addition, because children have different perceptions of time than adults making a month or year seem longer for a child, the courts are to assess the foreseeable future from the child's perspective. *In re E.L.*, 61 Kan. App. 2d at 328.

The facts paint a dismal picture for Mother. Although Mother completed an inpatient drug and alcohol treatment program in February 2024, her drug addiction was an ongoing problem. She relapsed in March 2024, testing positive for methamphetamine. She did not complete some of her UAs scheduled in March, April, and May 2024.

10

At the time of the termination hearing, Mother still had unresolved misdemeanor theft and possession charges. She was to be sentenced for a felony burglary conviction in the next month. At this point, K.P. had been in out-of-home placement for 16 months—since his birth. In that time, Mother had no unsupervised visits with K.P. Expert testimony indicated Mother did not have suitable housing for a child.

The district court found Mother was unable to care for K.P. and that unfitness was unlikely to change in the foreseeable future, noting her missed drug tests and inability to provide for K.P. The court found K.P. needed permanency due to his young age.

Viewing the evidence in the light most favorable to the State, as this court is required to do, the district court's fact-findings can be deemed highly probable. Mother's recent relapse and her missed drug tests indicate future drug abuse. In 16 months, Mother was unable to progress to unsupervised visits with K.P. and unable to provide a safe and suitable home for K.P. She would remain on felony probation for the foreseeable future—if not in prison—which had resulted in periods of incarceration throughout the case. K.P. needed permanency in a time frame reasonable to a child. A different judge may have weighed the evidence differently, but an appellate court cannot reweigh the evidence. There is sufficient evidence here.

*We have separated Mother's first issue into two issues.*

We separated Mother's issue into two parts: (1) Did the district court fail to find beyond a reasonable a doubt that her continued custody of K.P. was likely to result in serious emotional or physical damage to the child as required by 25 U.S.C. § 1912(f)? (2) Was the State's expert witness a qualified expert witness under 25 U.S.C. § 1912(f) and 25 C.F.R. § 23.122?

Under the Act, the district court's decision to terminate parental rights of an Indian child must be supported "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

An appellate court reviews whether, when viewing the evidence in the light most favorable to the State, "a rational factfinder could have found, beyond a reasonable doubt, that continued parental custody would have been likely to result in serious emotional or physical harm to the children." *In re L.M.B.*, 54 Kan. App. 2d 285, 298, 398 P.3d 207 (2017). As under state law, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 54 Kan. App. 2d at 298.

Expert testimony must support the district court's conclusion that continued parental custody is likely to result in serious emotional or physical harm to the child. *In re L.M.B.*, 54 Kan. App. 2d at 302. The qualification of a witness as an expert is generally a discretionary decision for the district court. But whether the district court used the correct legal standard is a question of law subject to de novo review. *In re M.F.*, 290 Kan. at 150. Social workers testifying as a qualified expert in a proceeding subject to the Act must have substantial education and experience in the area of social work beyond the typical qualifications for the profession. See *In re M.F.*, 290 Kan. at 155 (citing 44 Fed. Reg. 67,593). Federal regulations found in 25 C.F.R. § 23.122 clarify that the expert must be qualified to testify on the prevailing social and cultural standard of the Indian child's tribe.

The rules of evidence apply in a proceeding to terminate parental rights. K.S.A. 38-2249(a). One such rule requires a party to state a timely and specific objection to evidence for it to be considered on appeal. K.S.A. 60-404.

The requirement of a timely and specific objection allows the district court to act as an evidentiary gatekeeper, which is particularly important when it comes to expert testimony. It allows the expert's qualifications to be fleshed out on the record and avoid errors in the admission of such testimony. See *State v. Raskie*, 293 Kan. 906, 914-15, 269 P.3d 1268 (2012); *State v. Hatfield*, 60 Kan. App. 2d 11, 23, 484 P.3d 891 (2021).

When no objection is made to a district court's findings of fact or conclusions of law based on inadequacy, an appellate court can presume the district court found all facts necessary to support its judgment. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 510, 509 P.3d 1211 (2022).

Nancy Jasna testified she worked as a case manager at Firelodge Children and Family Service for the Potawatomi Nation Tribe. She had a bachelor's degree in business. She had been previously recognized as a qualified expert witness under the Act. She believed Mother's continued custody of K.P. was likely to result in serious emotional or physical damage to K.P. because Mother had been incarcerated and abused substances. She said she had the case since the beginning.

From the bench, the district court ruled Jasna was a qualified expert witness under ICWA. The court found there was evidence beyond a reasonable doubt that the child needed placement sooner rather than later due to his young age and need for permanency. The court stated it considered the physical, mental, and emotional health of the child. In its journal entry, the court found, "There is evidence beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *Child needs permanency and qualified expert witness testified to that fact.*" (Emphasis added.)

Mother first argues the district court erroneously used the "clear and convincing evidence" standard instead of the "beyond a reasonable doubt" standard to terminate her

13

parental rights. In fact, the district court used both. From the bench, the district court found there was "evidence beyond a reasonable doubt" that K.P. needed permanency. The court stated it had considered the physical, mental, and emotional health of the child.

In its journal entry, the court elaborated by stating, "There is evidence beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *Child needs permanency and qualified expert witness testified to that fact.*" (Emphasis added.) Mother does not challenge the sufficiency of the evidence to support this finding. Therefore, we may assume the district court found all facts necessary to support its judgment.

Mother further argues the State did not establish that Jasna was qualified to testify as an expert under 25 C.F.R. § 23.122. But Mother's failure to lodge a contemporaneous objection precludes appellate review of this issue. We do not know how Jasna would have responded had her qualifications been questioned before the district court.

*We address Mother's final issue, active efforts.*

Mother argues the district court erred in finding the State demonstrated "active efforts" to prevent breakup of the Indian family under 25 C.F.R. § 23.2 because St. Francis did not tailor the case plan to Mother's circumstances; St. Francis relied on Mother's probation officer to let them know if Mother was not attending drug treatment and relied on K.P.'s placement to supervise visits; and St. Francis did not actively assist Mother to obtain housing or work with her on a budget.

The State argues there was sufficient evidence of active efforts. The agency sent Mother to inpatient drug treatment; reminded Mother to provide her NA attendance records, mental health records, and proof of employment; tried to help her obtain

subsidized housing; and tried to schedule regular visitation. The agency's efforts were rebuffed or ignored by Mother.

Before a district court can terminate parental rights to an Indian child, the State must show that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).

Federal regulations define active efforts as follows:

"Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2.

The regulation then lists 11 examples of active efforts. They can be grouped into three categories: (1) active efforts to involve the child's Indian family and ensure the child's Indian culture is respected; (2) active efforts to keep the family together; and (3) active efforts to help the parents obtain necessary services and monitor participation in such services.

A parent's demonstration of lack of willingness to participate in services may be considered in determining whether the State used active efforts. *In re E.L.*, 61 Kan. App.

15

2d at 337. The record reveals Mother's lack of willingness to participate in her rehabilitation and we take that to account.

The State has the burden to prove by clear and convincing evidence that it used active efforts. Appellate courts review whether, viewing the evidence in the light most favorable to the State, a rational fact-finder could have found the district court's determination that the State used active efforts to be highly probable. *In re E.L.*, 61 Kan. App. 2d at 334.

Early in the case, St. Francis met with Mother and discussed the case plan. But Mother had minimal contact with St. Francis and did not complete any case plan tasks before her arrest in October 2023. She was heavily using drugs during that time.

Candace Quest was the case manager on this case beginning in January 2024. She was the only witness for the State to testify concerning the agency's efforts to rehabilitate the family. She testified St. Francis got Mother into an inpatient drug treatment program in January 2024. Later, Quest was in contact with Mother's probation officer, monitoring whether Mother had positive drug tests. Quest relied on Mother's probation officer to let her know if Mother was not attending her outpatient drug treatment. Quest asked Mother to send her screenshots of Mother's NA attendance.

St. Francis initially offered Mother weekly supervised visitation. But Mother did not attend visits with K.P. in 2023. After the court determined reintegration was no longer viable in January 2024, St. Francis offered Mother once-a-month visitations. Quest arranged for K.P.'s placement to supervise additional visits. Mother had to pass a drug test before visits.

Since July 2024, Mother was living at the Cozy Inn. Quest testified her primary concern about Mother was her housing situation; the only case plan tasks Mother had not

completed related to housing. Quest had not done a walk-through of Mother's hotel room, though she could have. Quest did not believe a hotel room was suitable housing for a child. Quest sent Landmark Authority a letter about housing for Mother. Landmark told Quest Mother never filled out an application.

Quest had not worked with Mother to see if her income was sufficient to support K.P. or to come up with a budget for Mother. Quest did not know the status of Mother's criminal cases. Mother's case plan tasks did not change throughout the case and were the same as Father's, who was incarcerated throughout the case. The district court found, without elaboration, that there had been active efforts to prevent breakup of the family.

On this point, Mother first argues St. Francis' case plan was not tailored to her circumstances. But she does not explain which case plan tasks were inappropriate or what additional tasks should have been added. Her case plan tasks touched on the major obstacles to her reintegration with K.P. including housing, financial support, and her drug usage.

Next, Mother argues that St. Francis exhibited a lack of effort in her drug treatment because Quest relied on Mother's probation officer to let her know if Mother was not attending treatment and asked Mother to send a screenshot of her at NA meetings.

Both of those examples show that St. Francis did engage in active efforts to monitor Mother's drug treatment. Quest testified St. Francis got Mother into a 28-day inpatient drug treatment program. Quest monitored Mother's drug treatment in part by staying in contact with Mother's probation officer. The probation officer would notify Quest if Mother was not attending her outpatient drug treatment. Quest also monitored Mother's treatment by asking Mother to send screenshots showing she was attending NA

meetings. And St. Francis required Mother to submit to UAs before visitations to ensure she was remaining drug free.

Mother argues St. Francis exhibited a lack of effort because it only offered her monthly visits and relied on K.P.'s placement to supervise additional visits. Once-a-month visitation is not "[s]upporting regular visits with parents" under 25 C.F.R. § 23.2(1) in the absence of a concern that more frequent visitation would impair the health, safety, or welfare of the child. But Quest testified that she reached out to K.P.'s placement to see if placement could supervise additional visits and K.P.'s placement agreed to do so. Mother ignores that St. Francis initially offered her weekly visitations and that she did not visit K.P. for the first eight months of his life because she was heavily using drugs and lacked interest.

Caselaw suggests that the State need not have made every possible effort, but its actions may not be merely passive ones, such as offering services and leaving it entirely up to the parent to take any further steps. See *In re L.M.B.*, 54 Kan. App. 2d 285, Syl. ¶ 3.

Mother is really arguing that the State could have done more than it did. Of course that is true—that is true for almost every human endeavor but that is not the question we must answer in this appeal. We must decide—viewing the evidence in the light most favorable to the State—if it is highly probable that a rational fact-finder could have found the district court's determination that the State used active efforts to assist Mother during this time. Viewing all this evidence collectively, in the light most favorable to the State, we must conclude that the State did employ active efforts to rehabilitate Mother in an effort to prevent the breakup of this Indian family.

In her claim, Mother's focus on the ways St. Francis failed to act ignores the ways that St. Francis did engage in active efforts to assist her. See *In re L.M.B.*, 54 Kan. App. 2d at 307. St. Francis attempted to engage Mother in the case plan and scheduled regular

visitation from the beginning, but Mother rebuffed St. Francis' efforts until she went to jail in October 2023. After Mother's release from jail, St. Francis got Mother into an inpatient drug treatment program and monitored her progress. This court cannot reweigh the evidence.

Mother has failed to convince us that there is any reversible error here.

Affirmed.