No. 120,996

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PAIGE HATFIELD,
*Appellant*.

SYLLABUS BY THE COURT

1.

Expert testimony may be admissible when scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue.

2.

The benchmark for determining whether expert testimony is admissible is not whether that testimony is scientific but whether it involves information outside the common realm of human experience—and obtained through reliable methods—that could meaningfully assist the jury in its deliberations.

3.

A person may testify as an expert if the person is *qualified* and if his or her opinions result from *reliable* methods or principles. A person is qualified when he or she has the requisite knowledge, skill, experience, training, or education to provide helpful insight on a matter that would benefit from expert opinion. Courts assess reliability by determining whether a person's testimony is based on sufficient facts or data and results from reliable principles and methods, as well as whether the witness has reliably applied the principles and methods to the facts of the case.

1

**4.**

The touchstone for reliability of expert testimony is not the correctness of the expert's conclusions but the soundness of his or her methodology.

**5.**

The district court, as evidentiary gatekeeper, has broad discretion to determine whether proposed expert testimony is admissible. And a district court has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable. A court only abuses that discretion when no reasonable person would take the view it adopted or when it bases its decision on an error of law or fact.

**6.**

The rejection of expert testimony is the exception rather than the rule. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof remain the traditional and appropriate means of attacking shaky but admissible evidence.

**7.**

K.S.A. 60-404 requires a party to raise a timely and specific objection to evidence in order for it to be considered on appeal. This requirement ensures that a district court has the opportunity to act as the evidentiary gatekeeper at trial.

**8.**

Expert testimony is not objectionable merely because it embraces an issue to be decided by the trier of fact. Such evidence may be admissible if it will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence.

9.

The decision whether to hold a pretrial hearing to determine the admissibility of expert-opinion testimony is a question entrusted to the district court's discretion. The purpose of such a hearing is to determine whether a witness qualifies as an expert and whether the witness' testimony satisfies the requirements of K.S.A. 2020 Supp. 60-456(b).

10.

Prosecutors have considerable latitude in crafting arguments. But a prosecutor's comments during closing argument must accurately reflect the evidence and accurately state the law. And those comments cannot be intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.

11.

It is improper for a prosecutor to make statements during closing argument that attempt to shift this burden of proof to the defendant. But there is a difference between the prosecutor shifting the burden of proof—asserting the defense must prove a crime was *not* committed—and pointing out the absence of evidence to support the defense argument that there are holes in the State's case.

12.

When a defendant challenges the sufficiency of the evidence, an appellate court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could find the defendant guilty beyond a reasonable doubt. The court does not reweigh the evidence, resolve evidentiary conflicts, or reassess witness credibility.

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed April 9, 2021. Affirmed.

*Stacey L. Schlimmer*, of Olathe, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., POWELL, J., and MCANANY, S.J.

WARNER, J.: K.G., a four-month-old child, developed difficulty breathing and exhibited seizure-like symptoms several hours after he was dropped off at Paige Hatfield's in-home daycare. After reviewing K.G.'s history and symptoms—multiple subdural hematomas, retinal hemorrhaging, and retinoschisis—doctors diagnosed him with abusive head trauma. The State charged Hatfield with aggravated battery and operating an unlicensed daycare, and a jury convicted her of both charges. She now appeals, challenging multiple aspects of the evidence and arguments presented during her trial. After carefully and thoroughly reviewing the record before us, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

K.G. was born in September 2016. Because both his parents worked, K.G.'s Mother enrolled him in Hatfield's Haven, an unlicensed daycare operated by Hatfield out of her Olathe home. K.G. began attending daycare in early January 2017 (after K.G.'s Mother's maternity leave expired).

On January 31—the twelfth day K.G. attended Hatfield's Haven—Mother dropped K.G. off at daycare at around 7:30 a.m. A little before 1 p.m., Hatfield took a picture of K.G., swaddled and smiling, and sent it to Mother. About 30 minutes later, Hatfield called 911 because K.G.'s eyes had rolled back in his head and he would not make eye contact. Paramedics found he was not breathing properly and, based on his posturing, may have experienced a seizure. An ambulance transported K.G. to Overland Park Regional Medical Center, where a computerized tomography (CT) scan revealed three

acute subdural hematomas (recent bleeding between certain membranes between the skull and brain), including bilateral subdural hematomas (bleeding on both the left and right sides of the head). K.G. was transferred to the pediatric intensive care unit at Children's Mercy Hospital later that afternoon.

Over the next several days, doctors examined K.G. for other injuries. K.G.'s injuries were largely internal; apart from soft tissue swelling on the top of his head, K.G. had no external injuries. But along with the subdural hematomas, K.G. had a subarachnoid hematoma (bleeding between deeper membranes between the skull and brain). K.G. also suffered from severe retinal hemorrhaging and vitreous hemorrhaging in both eyes. And doctors observed retinoschisis (a separation of the retina's layers) in both eyes. As a result of these injuries, K.G. has experienced developmental delays, loss of brain volume, and partial, if not complete, blindness.

Each of K.G.'s injuries—a subarachnoid and multiple subdural hematomas, retinal hemorrhaging, and retinoschisis—could stem from a medical condition, trauma, or an unknown cause. Trauma can be either accidental or nonaccidental. Because bilateral subdural hematomas and retinoschisis are often the result of significant force, doctors at Children's Mercy contacted the hospital's child-abuse section while Detective Brian Peters of the Olathe Police Department followed up on the 911 call.

Detective Peters interviewed Hatfield after K.G. was admitted to the hospital. Hatfield stated that she had not hurt K.G. and that there had been no accident. According to Hatfield, K.G. developed a wet cough after he fell asleep. When Hatfield tipped K.G. back, he spit up, and she called 911 after he would not make eye contact. Mother and Father also denied hurting K.G. or that an accident occurred to injure him.

At the same time, doctors attempted to determine the cause of K.G.'s injuries. Testing did not reveal an underlying medical condition. Mother related three earlier incidents since K.G.'s birth that had caused her concern:

- In early October 2016, K.G. fell off a bed while laying on Mother. Mother took him to Children's Mercy, and a CT scan showed no injuries.

- Later that month, Mother's car was rear-ended when K.G. was in a rear-facing car seat. Mother took K.G. to see his doctor, who concluded K.G. was a normal baby with no injuries.

- In mid-January 2017, K.G. was hospitalized for gastroenteritis at Children's Mercy; he was discharged January 26—five days before the incident that gave rise to the investigation. On January 27, Mother texted Hatfield, explaining K.G. had wiggled and fallen out of his Bumbo seat (a play-seat for infants).

The doctors determined none of these past incidents contributed to K.G.'s injuries. Given the severity of these injuries and because they were not caused by a medical condition or accidental trauma, Dr. James Anderst, head of the Children's Mercy child-abuse investigative unit, diagnosed K.G. with abusive head trauma—the nonaccidental infliction of head trauma by another. Based on Dr. Anderst's diagnosis and Detective Peters' investigation, the State charged Hatfield with aggravated battery and unlawfully operating a childcare facility.

Before trial, Hatfield filed a motion to exclude Dr. Anderst, who testified at the preliminary hearing, from testifying as an expert at trial. She argued his testimony was unreliable because it stemmed from a faulty differential diagnosis—meaning, his conclusions were based on excluding various potential causes (such as medical conditions and accidental trauma) rather than deriving his findings from observations of

6

K.G. or interpreting the tests performed on him. The court denied Hatfield's motion, finding Dr. Anderst was qualified through his education and experience and his methods for reaching his opinion and diagnosis were generally accepted in his field and supported by substantial documentation.

The case proceeded to a multiple-day jury trial. There, the State presented testimony from six doctors from a variety of disciplines, including Dr. Anderst, who treated K.G. All the doctors concluded K.G. presented acute symptoms consistent with a nonaccidental injury, though they differed as to when the underlying injury occurred. Dr. David Nielsen, a pediatric neuroradiologist, dated the blood on K.G.'s January 31 CT scan to be between 12 hours and a few days old. Dr. Christian Kaufman, a pediatric neurosurgeon, dated the same blood between 0 and 72 hours old, though he noted K.G. was more likely to have exhibited symptoms closer to when the injury occurred. And Dr. Anderst explained that blood cannot always be accurately aged using a CT scan because active clots, a combination of old and new trauma, and the blood's mixture with spinal fluid can affect the estimate. Dr. Anderst stated he believed K.G. was immediately symptomatic after whatever trauma he suffered occurred.

As part of her defense, Hatfield called Dr. Joseph Scheller to testify as an expert. Dr. Scheller, a pediatric neurologist with a subspecialty in neuroimaging, agreed that the blood on K.G.'s CT scan was acute—of recent origin—but suggested an alternative theory to explain K.G.'s injuries. He explained a minor injury from several months earlier likely allowed fluid to accumulate in K.G.'s skull; this fluid increased the pressure on K.G.'s brain, eventually tearing blood vessels and resulting in his injuries. In other words, Dr. Scheller believed K.G.'s injuries were a new manifestation of a chronic condition.

The jury found Hatfield guilty of both crimes charged. They also found that two aggravating factors—K.G.'s age and Hatfield's position of trust—warranted a sentencing departure. The district court thus imposed an 86-month prison sentence for the

7

aggravated-battery conviction and a nominal fine for the unlicensed-childcare-facility conviction. Hatfield now appeals her conviction for aggravated battery.

Hatfield challenges multiple aspects of the trial. She argues that the district court abused its discretion when it ruled on several evidentiary questions, ranging from allowing Dr. Anderst to testify as an expert witness to making cautionary statements while Hatfield's attorney questioned Detective Peters. She also alleges that the prosecutor committed multiple errors during closing argument and that these errors, individually or in combination, deprived her of a fair trial. And she claims there was not sufficient evidence presented to support her conviction for aggravated battery.

After carefully considering Hatfield's arguments, we find only one error, as the prosecutor misstated the nature of K.G.'s injuries by saying he suffered a neck contusion (not a contusion on the top of his head). But we are convinced that this misstatement did not change the outcome of the trial. We therefore affirm Hatfield's conviction.

1. *The district court did not err when it allowed Dr. Anderst to testify as an expert witness.*

Hatfield challenges three aspects of the expert testimony of Dr. Anderst—the head physician at the Children's Mercy child-abuse investigative unit who investigated K.G.'s injuries and ultimately diagnosed him with abusive head trauma. Hatfield argues that the district court erred when it allowed Dr. Anderst to provide expert-opinion testimony, claiming the doctor employed unreliable methods to reach his diagnosis. She also asserts that Dr. Anderst's testimony that K.G.'s injuries were caused by nonaccidental abusive head trauma usurped the role of the jury by opining on the question of intent. And she argues that the district court's decision to allow Dr. Anderst to testify as an expert witness without first conducting a dedicated hearing on that point (often called a *Daubert*

8

hearing) deprived her of an opportunity to cross-examine him before trial and infringed her right to confront witnesses against her.

### 1.1. *Dr. Anderst's testimony was based on and applied reliable methods and principles.*

Hatfield challenges multiple aspects of Dr. Anderst's expert testimony. She points out that Dr. Anderst's conclusions regarding the aging of the blood on K.G.'s CT scans conflicted with the opinions of other experts. She argues that the methodology Dr. Anderst employed—excluding potential causes of injury through investigation and then determining whether the remaining cause (here, nonaccidental head trauma) was consistent with K.G.'s medical documentation—was forensic in nature rather than medical or scientific. And she asserts that some of Dr. Anderst's opinions are inconsistent with medical literature and studies regarding abusive head trauma.

K.S.A. 2020 Supp. 60-456(b) governs the admissibility of expert-opinion testimony. Broadly speaking, expert testimony may be admissible when "scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." K.S.A. 2020 Supp. 60-456(b).

Since 2014, Kansas courts have employed a standard to determine whether proposed testimony will aid the jury that is "substantively identical" to Federal Rule of Evidence 702 and consistent with the discussion of that rule in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). *State v. Lyman*, 311 Kan. 1, 21, 455 P.3d 393, *cert. denied* 141 S. Ct. 174 (2020). A person may testify about his or her specialized—or expert—opinions if the person is *qualified* and if his or her opinions result from *reliable* methods or principles. A person is qualified when he or she has the requisite "knowledge, skill, experience, training or education" to provide helpful insight on a matter that would benefit from expert opinion. K.S.A. 2020 Supp. 60-456(b). And courts assess reliability by determining whether a person's

testimony is "based on sufficient facts or data" and results from "reliable principles and methods," as well as whether "the witness has reliably applied the principles and methods to the facts of the case." K.S.A. 2020 Supp. 60-456(b).

The district court, as evidentiary gatekeeper, has broad discretion to determine whether proposed expert testimony meets this threshold. See *In re Cone*, 309 Kan. 321, 327, 435 P.3d 45 (2019). A court only abuses that discretion when no reasonable person would take the view it adopted or when it bases its decision on an error of law or fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). Nevertheless, the "'rejection of expert testimony is the exception rather than the rule.'" *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 496, 369 P.3d 966 (2016). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Hatfield does not challenge Dr. Anderst's qualifications as an expert—he is not only a medical doctor but also leads Children's Mercy's child-abuse investigation unit. Instead, she argues that his testimony was unreliable because it was inconsistent with other experts and employed a different methodology than strictly reading and interpreting K.G.'s medical documentation.

The touchstone for reliability under K.S.A. 2020 Supp. 60-456(b) is "'not the correctness of the expert's conclusions but the soundness of his [or her] methodology.'" *Lyman*, 311 Kan. at 28 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 [9th Cir. 1995]). To underscore this point, our Kansas Supreme Court has explained that the "overarching subject" of the expert inquiry is "the evidentiary relevance and *reliability of the principles that underlie* a proposed expert submission." (Emphasis added.) *Lyman*, 311 Kan. at 28. In other words, the "'focus . . . must be solely on

10

principles and methodology, not on the conclusions that they generate.'" 311 Kan. at 28 (quoting *Daubert*, 509 U.S. at 595).

Just as district courts have broad discretion generally to determine whether to admit expert-opinion testimony, courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); see also *Lyman*, 311 Kan. at 22 (reliability is a flexible inquiry that "must be tied to the particular circumstances of the particular case"). And reliability can be demonstrated in a number of ways. *Daubert*, for example, discussed a nonexhaustive list of factors that a district court may consider when assessing the soundness of the scientific or technical method an expert employs: Has the method been tested? Has it been subjected to publication and peer review? Is there a known error rate or margin? Is the position generally accepted within the scientific or technical community? See 509 U.S. at 592-94. And the reliability of an expert's approach can also be demonstrated based on the expert's personal knowledge or experience, coupled with an explanation as to "'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Smart*, 52 Kan. App. 2d at 495.

Applying these principles here, our review of the record shows the district court did not err when it allowed Dr. Anderst to testify as an expert. At both the preliminary hearing and the trial, Dr. Anderst testified about the methods employed by medical professionals who investigate potential child abuse—observing a child's manifested injuries, investigating and ruling out potential causes of those injuries (such as medical conditions or accidents), and comparing any remaining sources of the injury with the child's medical and personal documentation. He also explained how he applied those methods to the specific facts and medical documentation in this case to reach his conclusion that K.G.'s injuries were caused by abusive head trauma.

11

Though Hatfield challenges numerous aspects of Dr. Anderst's opinions on appeal, many of her arguments are concerned with the credibility of the doctor's ultimate conclusions, not the methodologies he employed. For example, Hatfield points out that other witnesses (including two who testified for the State) indicated that K.G.'s CT scan showed blood that could (or potentially would) predate a January 31 injury at the daycare. Yet Dr. Anderst testified that in his experience, efforts to determine the age of blood through CT scans can be misleading and polluted by factors irrelevant to a child's immediate injury; for this reason, he looked to when the child started experiencing symptoms. Hatfield raises similar challenges to Dr. Anderst's statement that the soft-tissue swelling on the top of K.G.'s head could have been caused by blunt-force trauma—a statement potentially at odds with testimony from the medical professional who initially treated K.G. As the district court noted, this is a matter which Hatfield could—and did—explore through "thorough cross-examination." But this difference of opinion does not mean that the methods Dr. Anderst employed were unreliable.

Hatfield also points out several perceived deficiencies or inconsistencies in Dr. Anderst's testimony, arguing that these areas demonstrate that his opinions were not sufficiently rooted in the facts of the case or were based on unsound analysis. She asserts, for instance, that Dr. Anderst could not recall during cross-examination whether he consulted with social workers or detectives on the case to make sure he had all the facts necessary to render his opinion and could not recall the name of the person who described the blood initially drawn from K.G.'s subdural hematoma. She notes that Dr. Anderst could not recollect two authors' names when he was asked about various studies during cross-examination or how the circumstances of other studies could be applied to the facts of this case. And she argues that one law review article cited by Dr. Anderst relating to differential diagnoses—the approach he applied—can be read to question his method of analysis.

12

But these argued inconsistencies, while fair discussion for cross-examination or presentation of contrary opinions, do not render the district court's reliability finding unreasonable. Indeed, scientific inquiry by its very nature can lead to disagreement and evolving analysis. Accord *Daubert*, 509 U.S. at 596-97 (noting that "open debate is an essential part of both legal and scientific analyses," though "[s]cientific conclusions are subject to perpetual revision"). The fact that Dr. Anderst could potentially have done more during his investigation or could not remember specific details of a study during his testimony may affect the jury's assessment of his credibility, but it does not render his testimony inadmissible.

Finally, Hatfield argues that Dr. Anderst's deductive method of analysis—often called a "differential" diagnosis—is unreliable as a matter of course. According to Hatfield, Dr. Anderst used a forensic approach focused on eliminating potential causes of injury, not a technical or scientific analysis of the CT scan or K.G.'s other medical documentation. Hatfield raised this argument to the district court, both in her initial request for a pretrial *Daubert* hearing and at trial, emphasizing the difference between Dr. Anderst's analysis and that of a radiologist or other specialist. The district court disagreed, finding that Dr. Anderst had testified about "his methodology, his findings, the facts he used, [and] all the data he used" and that the methods and principles he relied upon were reliable.

As a starting point, we observe that the subject of expert-opinion testimony need not be "scientific" to be admitted. K.S.A. 2020 Supp. 60-456(b) recognizes that a jury's understanding may benefit from "scientific, technical or *other specialized knowledge*." (Emphasis added.) The benchmark for determining whether expert testimony is admissible is not whether that testimony is "scientific" but whether it involves information outside the common realm of human experience—and obtained through reliable methods—that could meaningfully assist the jury in its deliberations.

That said, there is significant medical and legal literature documenting differential diagnosis as a manner of ascertaining whether a child has suffered abusive head trauma. See Dr. Sandeep Narang, M.D., J.D., *A Daubert Analysis of Abusive Head Trauma/ Shaken Baby Syndrome*, 11 Hous. J. Health L. & Pol'y 505 (2011) (aggregating studies). Dr. Anderst's explanation of his methodology and his application of those principles was consistent with this literature. See 11 Hous. J. Health L. & Pol'y at 571-74. After reviewing K.G.'s injuries, he inquired as to K.G.'s medical history and family history to determine whether either could have caused his present condition. When he was confident he could exclude a preexisting medical condition and accidental injury as causes, Dr. Anderst reviewed all of K.G.'s medical documentation and any other information available to determine whether those were consistent with a nonaccidental injury—i.e. abusive head trauma. This approach was not, as Hatfield asserts, merely one of negation of other possible causes; it required a scientific reconciliation of K.G.'s medical tests and conditions to determine whether they could have resulted from traumatic abuse. Nor does the record show—as Hatfield argues—that Dr. Anderst's diagnosis was based solely on the presence of K.G.'s subdural hematomas, retinal hemorrhages, and altered mental state (often called the "triad" of injuries surrounding abusive head trauma); the doctor testified in detail about the analytic steps that led to his opinion of what caused K.G.'s injuries.

In considering whether Dr. Anderst could testify as an expert, the district court reviewed his testimony from the preliminary hearing. The court concluded that Dr. Anderst's approach to diagnose abusive head trauma was generally accepted in the medical community and that he adequately explained his methodology and findings to render his testimony reliable. The court did not abuse its discretion when it allowed Dr. Anderst to present expert-opinion testimony.

1.2. *Dr. Anderst's testimony did not impermissibly invade the province of the jury when he testified that K.G.'s injuries were nonaccidental.*

Hatfield also argues that the district court erred in allowing Dr. Anderst to testify because his opinions that K.G.'s injuries were nonaccidental and the result of abusive head trauma were improper legal conclusions that usurped the role of the jury. We do not find this argument persuasive for several reasons.

First, though Hatfield objected to the reliability of Dr. Anderst's expert testimony, she does not appear to have raised this particular question—whether his abusive-head-trauma diagnosis invaded the role of the jury—at trial. K.S.A. 60-404 requires a party to raise a timely and specific objection to evidence in order for it to be considered on appeal. See *State v. King*, 288 Kan. 333, 336, 204 P.3d 585 (2009) (compliance with K.S.A. 60-404 is required to preserve evidentiary issues for appellate review). This requirement ensures that a district court has the opportunity to act as the evidentiary gatekeeper—a role particularly important in issues involving the admission of expert testimony. See *Smart*, 52 Kan. App. 2d at 496. We are not convinced that Hatfield's general objection to Dr. Anderst's testimony allowed the district court to evaluate the admissibility of this evidence in light of the challenge Hatfield now asserts on appeal.

The fact that Hatfield's brief fails to address and acknowledge this preservation question is similarly problematic. Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 35) requires an appellant to cite "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on" in the district court. Or "[i]f the issue was not raised below," the brief must include "an explanation why the issue is properly before the court." (2020 Kan. S. Ct. R. 35.) Here, Hatfield merely cites to her general arguments regarding whether Dr. Anderst may testify as an expert; she does not point to an instance where she raised this particular challenge or explain why this court can (or should) consider the question for the first time on appeal. See *Ellie v. State*, 312 Kan.

15

___, 481 P.3d 1208 (2021) (declining to consider an argument when the State's briefing did not comply with Rule 6.02[a][5]).

Third, even if Hatfield's general objection were sufficient to preserve the present question for our review, Hatfield's argument would lack merit. Kansas law has long recognized that expert testimony is not objectionable merely because it embraces an issue to be decided by the trier of fact. See K.S.A. 2020 Supp. 60-456(d); *State v. Smallwood*, 264 Kan. 69, Syl. ¶ 4, 955 P.2d 1209 (1998). Rather, such evidence may be admissible if it "will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence." *State v. Steadman*, 253 Kan. 297, 304, 855 P.2d 919 (1993).

The Kansas Supreme Court applied this principle in *State v. Struzik*, 269 Kan. 95, 100-01, 5 P.3d 502 (2000), where it held that a district court did not err when it allowed an expert to testify in a felony murder case that medical evidence contradicted the defendant's argument that the victim's injuries were accidental. The court found that the "defining point" in its analysis was that the expert's testimony was "based on medical evidence involving the character and severity of [the victim's] injuries," not the expert's opinion of "Struzik's veracity or credibility." 269 Kan. at 101. Similarly, Dr. Anderst's testimony focused on the nature of his investigation and on K.G.'s injuries. The fact that he concluded those injuries were nonaccidental and the result of abusive head trauma does not render his opinions inadmissible. In short, Hatfield has not shown any error by the district court in allowing Dr. Anderst to testify.

1.3.    *The court did not violate Hatfield's constitutional right to confront witnesses when it denied her request for a pretrial* Daubert *hearing*.

In her final argument regarding Dr. Anderst's testimony, Hatfield contends the district court's decision not to allow the doctor to testify without first holding a pretrial "*Daubert* hearing" violated the Confrontation Clause of the Sixth Amendment to the

16

United States Constitution. She argues that because she was not given an opportunity to discuss the studies on which Dr. Anderst based his approach at a previous hearing, she was deprived of a meaningful opportunity for cross-examination on these issues.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *State v. Henderson*, 284 Kan. 267, Syl. ¶ 1, 160 P.3d 776 (2007); see also Kan. Const. Bill of Rights, § 10 (in criminal prosecutions, providing the accused the right "to meet the witness face to face"). This right to confront witnesses ensures that the defendant has the opportunity to cross-examine and thus test the credibility of the prosecution's witnesses. *State v. Friday*, 297 Kan. 1023, Syl. ¶ 19, 306 P.3d 265 (2013); see also *State v. Noah*, 284 Kan. 608, Syl. ¶ 5, 162 P.3d 799 (2007) (Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish").

The district court's decision did not impair Hatfield's right to effectively cross-examine Dr. Anderst. The decision whether to hold a pretrial hearing to determine the admissibility of expert-opinion testimony is a question entrusted to the district court's discretion. See K.S.A. 2020 Supp. 60-457(b). The purpose of such a hearing is "to determine whether [a] witness qualifies as an expert and whether the witness's testimony satisfies the requirements" of K.S.A. 2020 Supp. 60-456(b). K.S.A. 2020 Supp. 60-457(b). It is not intended to serve as a fishing expedition for testing every aspect of the witness' knowledge or a dry-run for defense counsel's cross-examination at trial. Accord *Daubert*, 509 U.S. at 596 (emphasizing that expert admissibility procedures were never intended to replace "[v]igorous cross-examination" at trial). Here, the district court concluded that Dr. Anderst's testimony during Hatfield's preliminary hearing—a hearing, we note, where Hatfield was present and cross-examined Dr. Anderst—rendered a separate hearing unnecessary.

And our review of the record demonstrates that Hatfield had an opportunity to effectively cross-examine Dr. Anderst when he testified at trial. Hatfield's counsel questioned Dr. Anderst extensively about his background, the studies on which he based his opinions, and the methods he used in his analysis. While she may not have known the exact articles Dr. Anderst relied on until that point, the lack of a separate pretrial *Daubert* hearing did not impair Hatfield's ability to generally examine and ask about the types of studies he used. Her challenge under the Confrontation Clause is without merit.

2. *The district court did not err when it cautioned Hatfield that certain questioning could open the door to admitting evidence of other crimes or civil wrongs.*

Hatfield next argues that the district court overstepped its judicial role and violated her constitutional right to present a defense when the court cautioned her that a question she asked Detective Peters during cross-examination might open the door to otherwise inadmissible evidence of other crimes and civil wrongs under K.S.A. 2020 Supp. 60-455.

Some further background is necessary for context. Detective Peters was assigned to investigate K.G.'s injuries. Late on the day K.G. was taken to the hospital, Peters interviewed Hatfield at her house before going to Children's Mercy to interview K.G.'s parents and discuss K.G.'s injuries with hospital staff. Over the next week, Peters executed search warrants for Hatfield's house and cell phone. He continued his investigation by researching Hatfield's and the parents' employment history, collecting K.G.'s medical records and reports, and speaking with Dr. Anderst.

During trial, Detective Peters described this investigation, explaining that he relied on all available evidence when determining whether a crime had occurred. In an effort to neutralize this testimony during cross-examination, Hatfield attempted to show that the detective's investigation relied too heavily on Dr. Anderst's diagnosis. To emphasize this point, she asked Peters to set aside Dr. Anderst's conclusions and specify "[w]hat

18

incriminating evidence do you have, would you consider to be incriminating during those interviews of Ms. Hatfield[?]"

The State then interrupted and noted that Hatfield's question might elicit unfavorable information. Outside the jury's presence, the State elaborated that Detective Peters might respond by mentioning two prior instances that raised concerns about how Hatfield cared for children. Hatfield asserted these instances either did not occur or were brought to light later in the investigation, and she only asked Peters about the January 31 interview. After considering both positions, the court cautioned Hatfield that if she decided to "go down that path any further," she "might open the door for this other information to come in."

Hatfield argues that this warning impermissibly limited her ability to shape and present her defense. We disagree. The court did not prevent her from asking any questions. She was free to engage in her defense strategy but apparently chose not to pursue her original line of questioning in case Detective Peters provided incriminating information. The district court did not err when it cautioned her about potential consequences of those earlier questions. See *State v. Boothby*, 310 Kan. 619, Syl. ¶ 1, 448 P.3d 416 (2019).

3.  *The prosecutor did not commit reversible error during closing argument.*

In addition to the evidentiary matters we have previously discussed, Hatfield argues she was deprived of a fair trial because the prosecutor veered outside the acceptable bounds of conduct in multiple ways during closing argument. We analyze claims of prosecutorial error through a two-step process. *State v. Chandler*, 307 Kan. 657, Syl. ¶ 5, 414 P.3d 713 (2018). First, we determine whether a prosecutor's actions fall outside the latitude afforded to attorneys arguing at trial. If a prosecutor engaged in impermissible conduct (that is, if the prosecutor erred), we proceed to the second step and

19

consider whether the error is reversible—whether the prosecutor's actions prejudiced the defendant's right to a fair trial under the constitutional harmless-error standard provided in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Chandler*, 307 Kan. 657, Syl. ¶¶ 6-7.

Prosecutors have considerable latitude in crafting arguments. See *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015). But the permissible scope of argument, though broad, is not unbounded. A prosecutor's comments during closing argument must "accurately reflect the evidence" and "accurately state the law." *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). And those comments "cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" 293 Kan. at 917.

Hatfield asserts that the prosecutor committed numerous errors in virtually every aspect of his argument, from attempting to shift the State's burden of proof to appealing to jurors' sympathies to misrepresenting the evidence. We address each of these allegations in turn. After thoroughly reviewing the parties' closing arguments and comparing them to the evidentiary record, we conclude that Hatfield has shown only one circumstance when the prosecutor's comments deviated from the scope of acceptable argument—when he mistakenly stated on two occasions that K.G. suffered a neck contusion instead of a contusion on the top of his head. But we are convinced beyond a reasonable doubt that these misstatements, which were passing references and not the focus of any discussion, did not affect the outcome of Hatfield's trial.

### 3.1.    *The prosecutor did not attempt to shift the State's burden of proof.*

Hatfield asserts that the prosecutor devoted much of his closing argument to addressing the defense's theories as to what occurred with K.G. rather than discussing the State's evidence. She contends that this discussion effectively shifted the State's burden of

proof to the defendant, implying that Hatfield needed to rebut the State's evidence in order to avoid a conviction.

Before the State can convict a person of a crime, and thus deprive him or her of liberty, it must prove the elements of that crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *Miller v. State*, 298 Kan. 921, 935, 318 P.3d 155 (2014). Thus, Kansas courts have long held that it is improper for a prosecutor to make statements during closing argument that attempt to shift this burden of proof to the defendant. See *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016). But courts have also routinely held that when the jury has been properly instructed that the prosecution bears the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence. See *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007). This is because there is a difference between the prosecutor shifting the burden of proof—asserting the defense must prove a crime was *not* committed—and "pointing out the absence of evidence to support the defense argument that there are holes in the State's case." *Pribble*, 304 Kan. at 837.

In his closing argument, the prosecutor began his discussion of the aggravated-battery charge by discussing "the evidence to support" that charge, focusing on the "medical evidence" and "the doctors' testimony." The prosecutor discussed K.G.'s injuries, noting the subdural and subarachnoid hematomas, the retinal hemorrhaging, and retinoschisis. The prosecutor noted that this last injury—the tearing of 8 to 10 layers of the retina—would result from "violent trauma" and "great force." Yet Hatfield had indicated that when K.G. arrived at her home on January 31, he was making eye contact and was able to see her.

The prosecutor then turned to the defense's theories as to what may have occurred. He prefaced his argument by noting that "the defense, their job is to point out to you

21

other theories, other reasons why there may be doubt, and they are going to point those out, and we're going to talk about them here." The prosecutor continued, arguing that the jury "ha[d] to consider, is what they are telling you reasonable? Does it actually cast doubt on what the doctors have told you?" The prosecutor then went on to discuss the various explanations for K.G.'s injuries that the defense had proffered throughout the course of the trial. The prosecutor concluded by again discussing the treating doctors' trauma diagnoses.

Viewed in this context, the prosecutor's statements did not shift the burden of proof to Hatfield. Instead, they considered whether any of these explanations or theories constituted reasonable doubt as to the explanation offered by the doctors at Children's Mercy—that K.G. had suffered abusive head trauma. These comments were thus within the bounds of permissible argument.

3.2. *The State did not err by showing the jury photographs of K.G. that had previously been admitted as evidence.*

During his rebuttal argument, the prosecutor offered two pictures of K.G.—one taken by Hatfield around 1 p.m. on January 31 and the other of K.G. intubated in a hospital bed at Children's Mercy—to demonstrate the marked difference in the child's condition during the day he spent at Hatfield's home. As he held the pictures, the prosecutor argued:

> "[K.G.] went to [Hatfield's] house like this. He was smiling. He was happy. He was making eye contact, and [the defense] want[s] you to believe that he went to this from nothing that she did, even though your common sense and your experience tells you that's not the case. You don't get those kind of head injuries, those kind of serious injuries to your eye and not have the results he did immediately."

Hatfield argues that these pictures were shown to deliberately invoke the sympathies of the jury and invite them to be persuaded by their emotions, not the facts of the case.

22

Though a prosecutor has wide latitude during closing argument, arguments must be based on the evidence. And emotions are not facts. A prosecutor thus errs when he or she makes statements to inflame the emotions of the jury or distract the jury from its duty to decide the case based on the evidence and the law. *Longoria*, 301 Kan. at 524.

The Kansas Supreme Court recently discussed the problems associated with purely emotional appeals in *State v. Thomas*, 311 Kan. 905, 468 P.3d 323 (2020). There, the defendant was charged with child abuse and other related crimes. During closing arguments, the prosecutor showed the jury photographs of the child's injuries, arguing the jury should acquit the defendant if they thought such conduct was permissible. The court found this argument impermissibly invited the jurors to make an "emotional assessment about what was okay" instead of deciding the case on the law and facts. 311 Kan. at 913.

The prosecutor's comments in this case are distinguishable from the prosecutor's arguments in *Thomas*, however. Instead of appealing solely to the jurors' emotions, the prosecutor here offered the pictures to show the difference in K.G.'s condition over the course of a short period of time, arguing that Hatfield (who was caring for K.G.) must be responsible for the change. These arguments were offered after Hatfield's attorney's closing argument, which emphasized Dr. Scheller's theory that K.G.'s injuries were a delayed manifestation of previous injury.

Courts analyze claims of prosecutorial error based on the specific facts and particulars of each case. See *State v. Sherman*, 305 Kan. 88, 110-11, 378 P.3d 1060 (2016). Though the prosecutor's use of the photographs during rebuttal may have had a powerful impact, the prejudicial nature of evidence does not render it off-limits for argument. After all, relevant evidence by its very nature is prejudicial. Both photographs the prosecutor showed here had previously been admitted for the jury's consideration.

23

And the photographs were offered in the context of arguing critical facts of the case. The prosecutor's actions were within the scope of acceptable argument.

      3.3.    *The prosecutor did not commit reversible error by mischaracterizing or misstating the evidence.*

As we have discussed, prosecutors (and attorneys generally) enjoy considerable leeway to explore and explain the evidence during closing argument. This leeway includes broad discretion to decide "the language and the manner" of the prosecutor's presentation. *State v. Hall*, 292 Kan. 841, Syl. ¶ 4, 257 P.3d 272 (2011). But the prosecutor's statements must remain within the parameters of the evidence presented. Thus, a prosecutor may "draw reasonable inferences from the evidence" but may not "comment upon facts outside the evidence." 292 Kan. at 848. A prosecutor may argue the evidence presented, emphasizing the strengths of the State's case and the weaknesses of the defendant's arguments. *Pribble*, 304 Kan. at 837-38. But the prosecutor may not misstate the evidence or argue facts that were never presented or established. See *Chandler*, 307 Kan. at 675-79. In short, the prosecutor's comments must remain "consistent with the evidence." *Hall*, 292 Kan. 841, Syl. ¶ 4.

Hatfield asserts the prosecutor made numerous comments during closing argument that were unsupported by or mischaracterized the evidence. Because these statements require discussions of particular facts and inferences, we discuss each allegation before considering whether the prosecutor's actions deprived Hatfield of a fair trial.

*"Suddenly blind"*

Hatfield asserts that the prosecutor erred when he described K.G. as being rendered "suddenly blind" as a result of his injuries. This statement arose during the prosecutor's discussion of K.G.'s retinoschisis—tears in the retinal layers, which Dr. Anderst described as being caused by significant violent force—and Hatfield's theory,

provided by Dr. Scheller, that this condition was caused by gradually increasing intracranial pressure. The prosecutor argued:

> "The problem for the defense is that Ms. Hatfield has already told you that morning that [K.G. is] looking at her, he's making eye contact, he's able to see her, and then she clearly described during her care *he's not able to see her* because his eye has been torn apart by that violent action that all the experts agree occurs, with the exception of [Hatfield's expert]." (Emphasis added.)

The prosecutor continued this line of discussion when noting the implausibility that K.G.'s injuries occurred several hours earlier while he was in Mother's care, arguing the jurors should "[u]se your own experience and knowledge" and compare Hatfield's theory with the fact K.G. is "just *suddenly blind*, and he suddenly has a subdural hematoma, and he suddenly is unconscious, and he suddenly is having seizures. Is that reasonable?" (Emphasis added.)

Hatfield argues these statements are unsupported by the evidence, as no medical evidence indicated that K.G. left her house blind. Rather, K.G. was first diagnosed with retinoschisis and retinal hemorrhages about a week after his admittance to Children's Mercy, and doctors never pinpointed exactly when K.G. became blind. Hatfield points out that she only informed the detective and medical professionals that K.G. did not make eye contact, not that he was unable to see.

But Hatfield interprets the prosecutor's argument too literally. The prosecutor was arguing the difference between K.G.'s condition early in the afternoon on January 31 and shortly thereafter when he was taken to the hospital, asking the jurors to consider the likely cause for such a drastic change. The prosecutor's statements did not mischaracterize or misstate the evidence.

*Multiple medical opinions that K.G. suffered abusive head trauma*

Hatfield claims the prosecutor misled the jury when he indicated that K.G. had been diagnosed by multiple doctors with abusive head trauma. As background, K.G. received treatment at a minimum of three hospitals for his injuries: Overland Park Regional Medical Center, Children's Mercy, and Madonna Hospital in Nebraska. Though doctors at multiple institutions treated K.G., Dr. Scheller—Hatfield's expert—expressed concern that K.G. never received a second opinion to verify his abusive head trauma diagnosis. Instead, Dr. Scheller believed the physicians did not question K.G.'s diagnosis once it was made. Hatfield's attorney emphasized this concern during her closing argument.

During rebuttal, the prosecutor sought to address this concern by indicating that these three hospitals treated K.G. for abusive head trauma. The prosecutor argued:

"[Defense attorney] talked to you about second opinions. There is no second opinion here.

"Look at the evidence. He went to Overland Park Regional. The impression: Acute abusive head trauma.

"He went to Children's Mercy. The impression: Acute abusive head trauma.

"He went to Madonna Hospital in Nebraska, an acute abusive head trauma.

"The same thing as Saint Luke's. [K.G. is] blind, he cannot walk, and he had all that brain damage due to what happened at [Hatfield's] home. That is the evidence."

Hatfield argues these statements were misleading because there was no evidence that Overland Park Regional, Children's Mercy, and Madonna Hospital performed independent diagnoses. But again, she interprets the prosecutor's statements too narrowly. The prosecutor did not argue that doctors at each facility diagnosed K.G. independently. Instead, he pointed out that all three facilities agreed that K.G.'s injuries were consistent with abusive head trauma. The prosecutor did not misstate the facts.

*Mother's texts concerning the Bumbo seat*

At trial, Hatfield argued the possibility that K.G.'s injuries were caused when he wiggled out of the Bumbo seat on January 27—four days before he was taken to the hospital—and that Mother's texts to Hatfield about the incident were an effort to cover up his injuries. During closing argument, the prosecutor addressed that theory, asking the jurors whether it was reasonable to interpret Mother's texts in such a way. The prosecutor then pointed out that despite these texts, which the prosecutor interpreted as cautioning Hatfield against keeping K.G. in an infant seat, Hatfield sent Mother a picture a few days later with him in a Bumbo seat—a picture, the prosecutor argued, where it was not clear if K.G. was strapped in correctly. The prosecutor noted that this did not really matter—it was a "red herring"—though he implied that it undermined Hatfield's position that she would never do something to put K.G. in harm's way. Accord *State v. Hachmeister*, 311 Kan. 504, 514-15, 464 P.3d 947 (2020) (recognizing that evidence, and inferences from that evidence, may be referenced for limited purposes during closing argument).

This line of discussion was perhaps inartfully crafted. But it was not, as Hatfield asserts, an attempt to convict Hatfield through stacking of inferences or innuendo. Instead, it was a permissible—albeit convoluted—analysis of a defense theory in light of witnesses' testimony.

*Comments regarding the testimony of Dr. Nielsen and Dr. Scheller*

Hatfield also argues that the prosecutor mischaracterized the testimony of two witnesses—Dr. Nielsen (who testified as an expert for the State) and Dr. Scheller (who testified as an expert for the defense). Dr. Nielsen, the pediatric neuroradiologist at Children's Mercy, estimated that K.G.'s January 31 CT scan showed blood between approximately 12 hours and a couple of days old. During closing arguments, the prosecutor described Dr. Nielson's testimony as finding the blood was "about 12 hours" old. The prosecutor then contrasted Dr. Nielsen's isolated analysis with Dr. Anderst's

explanation for why determining the age of blood through CT scans can often be misleading. While the prosecutor's summary of Dr. Nielsen's analysis could have been more comprehensive, a prosecutor is not required (nor is there time) to summarize every aspect of a witness' testimony during closing argument. The prosecutor's statement that Dr. Nielsen concluded the blood in K.G.'s CT scan was "about 12 hours" old was consistent with the doctor's testimony.

And the prosecutor's arguments regarding Hatfield's expert witness, Dr. Scheller, were also permissible. Dr. Scheller's testimony at trial extended over the course of two days, with Hatfield's direct examination of the witness beginning one afternoon and the State's cross-examination beginning the next morning. During Dr. Scheller's direct examination, he testified that he believed K.G.'s subdural hemorrhaging was a "recent, very recent" development that had occurred on January 30 or 31, and he did not believe the CT scan showed "old blood."

The State asked the court reporter to prepare a transcript of Dr. Scheller's testimony before it cross-examined him the following day. During cross-examination, Dr. Scheller clarified that he believed K.G. had suffered an injury sometime in "October, November, [or] December" to cause separation of the layers covering K.G.'s brain, even if the actual separation was very recent. The State used the transcript to ask Dr. Scheller about inconsistencies with his testimony the previous day. Hatfield asked to see a copy of the transcript the State was using but did not otherwise object to this line of questioning.

During closing argument, the prosecutor again pointed to what he believed were inconsistencies in Dr. Scheller's testimony, implying the doctor may have altered his position after talking with Hatfield's attorney following his direct examination. Contrary to Hatfield's assertions, this discussion was fair argument based on the record and did not mischaracterize Dr. Scheller's testimony or impermissibly comment on his credibility.

28

*Neck contusion*

Lastly, Hatfield argues that the prosecutor misstated the facts, and thus misled the jury, when he incorrectly stated that K.G.'s injuries included a neck contusion instead of a contusion on the top of his head. We agree that the prosecutor's comments were not supported by the evidence. But we do not find that these comments, when viewed in context and in light of the trial as a whole, affected the outcome of the case.

When he was taken to Children's Mercy, K.G. was treated for numerous injuries, including subdural and subarachnoid hematomas, retinal and vitreous hemorrhaging in both eyes, and retinoschisis. One of the only external manifestations of these injuries, other than K.G.'s eyesight, was a contusion (i.e. swelling) on the top of his head. When the prosecutor initially asked Dr. Anderst about these injuries during direct examination, the attorney confused this top-of-the-head contusion with a neck contusion, asking with reference to K.G.'s external symptoms, "If my recollection serves me, he didn't have anything other than maybe a contusion on his neck?" Dr. Anderst responded, "That was on top of his head." Hatfield did not object to this exchange.

During closing argument, the prosecutor twice more indicated that K.G. suffered a neck contusion (not a contusion on the top of his head). During the initial phase of the prosecutor's closing argument, he summarized K.G.'s injuries, stating:

> "The findings were that [K.G.] presented to Overland Park Regional with a subdural hematoma. He had bleeding on the brain, and every medical professional that got up there in front of you over the course of this week said, 'That is not normal.' 'That is not supposed to happen.'
>
> "Not only did [K.G.] have one subdural hematoma, he had three. He had one on each side, and he had one on the rear of his head. *He also had a contusion on the back of his neck.*
>
> "[K.G.] had retinal hemorrhaging. Again, an injury that's serious. [K.G.] had hemorrhaging in the vitreous fluid of his eye, a serious injury.

29

> "The most serious of all, [K.G.] had retinoschisis. That is tearing of those eight to ten layers of the retina, which caused a cavity in both of his eyes, and that's significant. Even the defense expert says, 'That's a big deal.'" (Emphasis added.)

The prosecutor then continued to discuss the retinoschisis, emphasizing the degree of force necessary to cause that injury.

Hatfield's defense attorney did not mention the State's reference to a neck contusion during her closing argument. And the prosecutor did not explain or reference the supposed neck contusion again until his short rebuttal argument, when he again summarized K.G.'s injuries, saying:

> "Look at your notes, and you will see the evidence is clear. [K.G.] had a subarachnoid hemorrhage. It's a serious internal hemorrhage. He had a subdural hematoma. He had retinal hemorrhaging. He had vitreous hemorrhaging. *He had a neck contusion*, and most importantly he had a retinoschisis." (Emphasis added.)

Upon reviewing the context of these comments, we are confident they were merely misstatements based on the prosecutor's mistaken recollection rather than intentional efforts to mislead the jury. The prosecutor did not emphasize or even discuss the swelling on K.G.'s neck (or head) beyond these two passing references. The prosecutor's comments in this case are thus markedly different from the problematic statements in *Chandler*, where the prosecutor misstated the facts and then argued multiple inferences from her erroneous factual statements. See 307 Kan. at 675-77.

Yet there can be little question that the prosecutor erred. There was no evidence that K.G. suffered swelling on his neck—a symptom common when an infant has been shaken. And even unintentional errors can color a jury's evaluation of the evidence. We thus must consider whether the prosecutor's statements affected the outcome of the trial. See 307 Kan. 657, Syl. ¶¶ 6-7.

30

We conclude they did not. The issue at Hatfield's trial was not what injuries K.G. suffered or whether they were inflicted by shaking, but rather when K.G.'s injuries arose and who inflicted them. Indeed, everyone agreed that K.G. had a subarachnoid and subdural hematomas, retinal and vitreous hemorrhages, and retinoschisis. The defense's theory, which the jury apparently did not believe, was that these injuries were either the result of a recent injury when K.G. was not at the daycare or a delayed manifestation of an injury that occurred weeks or even months before. The prosecutor's erroneous statement that K.G. had swelling on his neck rather than the top of his head had no bearing on that question. We are convinced beyond a reasonable doubt that the prosecutor's misstatements did not contribute to the jury's verdict.

4. *Hatfield has not shown multiple errors that would give rise to a claim of cumulative error.*

Hatfield argues that even if these alleged errors are not individually reversible, their combination deprived her of a fair trial. See *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019). But in cases where no error or only a single error is found, there are no errors to accumulate and therefore no basis to reverse a conviction. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012). We have found only one error in this case—the prosecutor's mistaken reference to a neck contusion (instead of a contusion on the top of his head). As we have already explained, that error does not cause us to lose confidence in the jury's verdict. Because we have found no other errors in our review, Hatfield's allegation of cumulative error is without merit.

5. *Sufficient evidence supports Hatfield's aggravated-battery conviction.*

Lastly, Hatfield argues that the evidence presented at trial was insufficient to support her aggravated-battery conviction. When a defendant challenges the sufficiency

of the evidence, an appellate court reviews the evidence "in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Rosa*, 304 Kan. 429, Syl. ¶ 1, 371 P.3d 915 (2016). The court does not reweigh the evidence, resolve evidentiary conflicts, or reassess witness credibility. *State v. Keel*, 302 Kan. 560, 566, 357 P.3d 251 (2015).

As Hatfield's impassioned argument on this point demonstrates, this was not a clear case. Hatfield correctly notes that K.G. had little to no external symptoms of abuse, and the various experts who testified disagreed when K.G.'s injuries occurred and whether they were accidental or intentional. But the jury considered this evidence and concluded that the State had shown beyond a reasonable doubt that Hatfield committed aggravated battery. It is not the role of an appellate court to reweigh that evidence or second-guess the jury's findings as long as there is evidence in the record supporting each element of the crimes charged. See *State v. Dobbs*, 297 Kan. 1225, 1238, 308 P.3d 1258 (2013).

To prove aggravated battery, the State was required to show that Hatfield knowingly caused K.G. great bodily harm. K.S.A. 2020 Supp. 21-5413(b)(1)(A). There is no question that K.G. suffered great bodily harm. Multiple experts testified that the nature of K.G.'s injuries showed they were not accidental, but rather the result of abusive trauma—in other words, that they were knowingly inflicted. And Dr. Anderst testified that he believed K.G.'s symptoms presented themselves immediately after he had been injured—when he was in Hatfield's care. When viewed in a light most favorable to the State, sufficient evidence supports Hatfield's conviction.

Affirmed.